Larry GOULD, Sharron Harmon, Estate of Dennis Kemper, Jr. by Dennis Kemper, Sr., Administrator, Dennis and Sue Kemper, Parents of Dennis Kemper, Jr., Blue Cross and Blue Shield of Kentucky, Inc., Commonwealth of Kentucky Cabinet for Human Resources, Appellants,

v.

CHARLTON COMPANY, INC., Commercial Pavers, Inc., Appellees.

No. 95–SC–115–DG.

Supreme Court of Kentucky.

Sept. 26, 1996.

E. André Busald, Busald Funk Zevely, P.S.C., Florence, Steven C. Schletker, R. Matthew Moore, Schletker Hornbeck & Moore, Covington, Meredith L. Lawrence, Lawrence & Associates, Crestview Hills, Leslie Renee Ray, Day Smith Walton & Durham, Louisville, Randall K. Justice, Assistant Counsel, Cabinet for Human Resources, Frankfort, for appellants.

William T. Robinson, III, Thomas H. Stewart, Greenebaum Doll & McDonald PLLC, Covington, for appellees.

KING, Justice.

This case presents two issues of profound importance: (1) what is the test to be applied by a trial court in determining whether a juror is disqualified from further jury service as a result of being exposed to extra-judicial information during the course of a trial; and (2) in such an instance, what is the standard of review of the trial court's ruling?

## SUMMARY OF FACTS

On May 15, 1989, appellee, Charlton Company, Inc., entered into a contract to repave certain portions of U.S. 42 located in Gallatin County. This repaving work was largely subcontracted by Charlton to appellee, Commercial Pavers, Inc. Three days after the work was completed, appellant Dennis Kemper, was driving east on U.S. 42 with his passenger, Graves Bogardus, Jr. At the same time appellant Larry Gould, accompanied by his passenger, appellant Sharron Harmon, was driving in the opposite direction on the same highway. The two cars collided. Kemper and Bogardus were killed and Gould and Harmon were seriously injured.

Gould and Harmon and the personal representatives of the estates of Kemper and Bogardus filed suit against Charlton and Commercial Pavers alleging the contractors had negligently repaved the highway and created an unsafe condition for the motoring public. Charlton and Commercial Pavers settled with the Bogardus estate while Gould, Harmon and the Kemper estate proceeded to trial on March 10, 1993.

At trial the jury heard evidence that although the repaving contract specified a tapered elevation not to exceed one inch in height at the highway's edge, there was a drop off of six to eight inches at the time and place of the collision. Although the dangers presented by such a drop off were known to Charlton and Commercial Pavers, there were no signs cautioning the public of this roadside hazard. As the cars approached, Kemper's car, being driven at an excessive speed, went off the shoulder. As Kemper attempted to regain control and get back on the road, the car catapulted across the highway and smashed into the Gould automobile.

On the eighth day of trial, all parties announced they had completed proof and court was recessed for lunch. During the lunch recess juror # 2 informed the trial judge that juror # 12 had spoken to him about the facts of the case on two occasions. The juror explained that during an earlier recess juror # 12 had expressed an opinion that Charlton and Commercial Pavers were not liable because Kemper had operated his car at an excessive speed. On the last day of proof, juror # 12 expressed the opinion that Charlton and Commercial Pavers were liable because he had overheard someone at a local bar comment that the companies had settled with the Bogardus family.

The trial judge immediately informed the parties of this disclosure. Charlton and Commercial Pavers promptly made a motion for a mistrial based upon juror misconduct. The trial court took the motion under advisement and adjourned for the weekend. When the trial resumed, the trial court placed each juror under oath and questioned each individually and out of the presence of each other. All jurors were asked if anyone had spoken to them about the case, whether they had spoken to anyone about the case and whether they could decide the case based solely on the evidence presented. Counsel were permitted to participate in the questioning of the jurors. Furthermore, each juror was directed not to discuss any aspect of this matter with anyone, including other jurors. As a result of the extensive inquiry by both the court and counsel, it was determined that only jurors # 2 and # 12 had been exposed to extra-judicial information.

Juror # 2 was comprehensively questioned by both the court and counsel. Pertinent portions of juror # 2's testimony are as follows:

The Court: Was he (juror # 12) just making an observation to you or was he trying to be persuasive? [When he stated he did not think the defendants were liable.]

Juror # 2: I guess he was just more or less trying to give his opinion about what he thought about it.

The Court: Did you respond to him in any way?

Juror # 2: Well, on the first conversation when he was telling me about that, I said "Yeah, it could happen that way". But like I said, I haven't made up my mind one way or the other yet. And then Friday when he was talking about it, he said he had found out that the one had settled out of court.

The Court: Is that persuasive to you or have any bearing in your mind?

Juror # 2: No, because its just like I was telling you Friday after court, when I was telling you, it doesn't change my mind because to me that would be like getting a traffic ticket. You know nine times out of ten when you get a traffic ticket, you're going to go ahead and pay it because you don't want to fool with having to pay a lawyer, court costs, whether you believe you're guilty or not. So that hasn't changed my opinion.

The Court: And that's the way settlements work. You know, a lot of settlements nobody is happy with; its a resolution of a difficult problem for everybody.

Juror # 2: It just saves a lot of time and hassle.

. . . .

Counsel for Charlton/Commercial    Sir, when this statement was made to you, or this information was given to you, in the conversation, did you ask the other person where he or she got this information?

Juror # 2: No.

Counsel: How he came to know about it?

Juror # 2: No, sir, because to me we're not supposed to talk about it, you know. I really didn't want to hear it; I don't want to hear it.

. . . .

Counsel: He mentioned a name?

Juror # 2: All I can remember about it is he said that the one family settled out of court for I think it was $450,000, something like that, and he said because the guy was closing down his skid business, whoever that is. I don't even remember the guy's name or anything . . . .

At the conclusion of the questioning of the individual jurors, the trial judge reassembled the jury in open court and gave a curative admonition emphasizing the uniqueness of the jury's role and the importance of its decision. The jury was instructed to decide the case solely and exclusively upon the evidence heard in the courtroom and the instructions provided by the court. At the conclusion of the admonition, the jurors were asked to "search [their] soul" for any reason why they could not adhere to the admonition. The trial court provided an inviting environment for the jurors to express any reservation. None did. The trial judge then individually polled each juror specifically inquiring whether each could decide the case consistent with the court's admonition. All jurors stated they could.

The trial court then excused juror # 12 but permitted juror # 2 to remain on the jury. Charlton's and Commercial Pavers' Motion for a mistrial was overruled. The jury was instructed, closing arguments were presented and the jury retired to deliberate.

The jury unanimously found Charlton and Commercial Pavers negligent. Ten jurors found Gould and Harmon were not negligent and ten jurors agreed that Charlton and Commercial were sixty percent at fault for causing the collision and Kemper forty percent responsible.

Following the trial, juror # 2 and the jury foreperson filed affidavits in support of the verdicts. In his affidavit, juror # 2 stated that he had fully complied with the court's admonitions of March 19 and 22, 1993 and that he:

1.  Did not communicate with anyone concerning juror # 12's unsolicited comments;

2.  Did not consider any of the extra-judicial information during deliberations;

3.  Did not mention the settlement to any other juror before or during deliberations; and

4.  The subject of the prior settlement was never discussed during jury deliberations and played no role in the jury's verdict.

The jury foreperson's affidavit confirmed that at no time during jury deliberations was there any discussion of the Bogardus settlement and that it played no part in the jury's deliberative process.

Following entry of judgment in the collective sum of $2,690,441.39, the trial court denied Charlton's and Commercial Paver's motion for a new trial.

Before the Court of Appeals, Charlton and Commercial Pavers argued for reversal contending that juror # 2 should have been dismissed from the jury and a mistrial granted. The Court of Appeals held that it was:

> clearly arguable that the [trial] court did not abuse its considerable discretion by determining that juror # 2 was sufficiently rehabilitated so that his continued service on the jury neither prejudiced appellants' rights nor deprived them of their rights to a fair trial. Recently, however, a majority of the Kentucky Supreme Court effectively declared that the concept of "rehabilitation" of jurors no longer exists for purposes of Kentucky law.

Upon the belief that *Montgomery v. Commonwealth,* Ky., 819 S.W.2d 713 (1991), mandated such a result, the Court of Appeals reluctantly reversed the trial court. Due to the importance of this issue, we granted discretionary review. Because the Court of Appeals misconstrued and misapplied *Montgomery,* we reverse and reinstate the judgment entered by the trial court.

## THE JURY SELECTION PROCESS

A jury is a deliberative body of citizens called upon to make factual determinations by weighing evidence and assessing the credibility of witnesses. The right to a trial by jury includes the right to a jury composed of fair and impartial members.

█ It is the responsibility of the trial court to determine whether a venire person is qualified for jury service. Present in the courtroom, able to view the demeanor of the prospective jurors, the trial judge has long been vested with broad discretion in making this determination. *Williams v. Commonwealth,* 254 Ky. 647, 72 S.W.2d 31 (1934);

*Bowling v. Commonwealth,* Ky., 873 S.W.2d 175 (1994).

In the case before us, the court and counsel for the respective parties conducted an extensive voir dire examination. As a result, fourteen qualified panel members were selected for jury service (one juror was dismissed by agreement of all parties on the fifth day of trial). Having been found qualified to serve as a juror, the issue before us is whether the subsequent acquisition of the extra-judicial information rendered juror # 2 unqualified to serve further. Because juror # 2 acquired this information during trial and this issue was properly raised by Charlton's and Commercial Paver's motion for a mistrial, it is within the context of the trial court's authority to grant a mistrial that this matter must be reviewed.

## MOTION FOR MISTRIAL

Since the beginning of our republic, American courts have recognized that they have the inherent power to address any incident having an improper impact on a pending jury trial. This power and responsibility was described by Justice Story in *United States v. Perez,* 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824), and his words are as meaningful today as they were when written almost 175 years ago:

> [T]he law has invested courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes....

In ruling upon a motion for mistrial the trial judge is confronted with a plethora of competing interests. The public has an interest in effective and efficient legal proceedings calculated to lead to fair and just results. The litigants have an interest in having their legal matters addressed fairly,

promptly and economically. Granting a mistrial delays justice and dramatically increases the costs of the proceedings to both the public and parties. A mistrial inconveniences litigants, jurors and witnesses. Because of the possible unavailability of some witnesses at a future trial date, granting a mistrial has the potential for changing the outcome of a case.

■ A motion for mistrial presents not only competing interests but also an unlimited number of varying and unique situations. For these reasons rigid, per se standards have been rejected. In order for a trial judge to grant a mistrial the record must reveal "a manifest necessity for such an action or an urgent or real necessity". *Skaggs v. Commonwealth*, Ky., 694 S.W.2d 672, 678 (1985) (citations omitted). This test permits a balancing of the competing interests present whenever a motion for a mistrial is advanced. Furthermore, it recognizes that each situation must be analyzed according to the unique facts presented. Although *Skaggs* was a criminal case, its flexible standard is appropriate in civil cases and we so hold.

It is universally agreed that a mistrial is an extreme remedy and should be resorted to only when there is a fundamental defect in the proceedings which will result in a manifest injustice. The occurrence complained of must be of such character and magnitude that a litigant will be denied a fair and impartial trial and the prejudicial effect can be removed in no other way. See *Schuttler v. Reinhardt*, 17 N.J.Super. 480, 86 A.2d 438 (App.Div.1952); *Back v. Duncan*, 246 Ark. 494, 438 S.W.2d 690 (1969); *Kresel v. Giese*, 231 N.W.2d 780 (N.D.1975); and *Clark v. Chapman*, 238 Va. 655, 385 S.E.2d 885 (1989). The standard set forth by the Supreme Court of West Virginia in *Reed v. Wimmer*, 195 W.Va. 199, 465 S.E.2d 199, 207 (1995), a personal injury action, is representative:

> Mistrials in civil cases are generally regarded as the most drastic remedy and should be reserved for the most grievous error where prejudice cannot otherwise be removed. [Citation omitted.]

## APPLICABILITY OF *MONTGOMERY*

In determining whether the trial court properly overruled Charlton's and Commercial Paver's motion for a mistrial, we do not find *Montgomery, supra*, 819 S.W.2d 713, dispositive. *Montgomery*, a criminal case concerning jury selection, involved jury panel members who acknowledged during voir dire that they had formed an opinion of the defendant's guilt and other panel members who had a long and close relationship with people or institutions involved with the case to be decided.

*Montgomery* holds that a jury panel member otherwise disqualified from jury service by reason of bias or prejudice does not become qualified by answering the "magic question". A brief answer to a leading and conclusionary question does not outweigh the influence lurking in a formed opinion or the influence incident to a close personal relationship. In order to prevent the substitution of form over substance, we stressed that the "magic question"

> ... is just another question where the answer may have some bearing on deciding whether a particular juror is disqualified by bias or prejudice ... *Id.* at 718.

Unlike *Montgomery*, in the case before us juror # 2 neither expressed nor formed an opinion based upon his exposure to the extra-judicial information. Here, the trial court's inquiry was calculated to discover the views of juror # 2 rather than influence them. The trial judge did not find that juror # 2 was "rehabilitated" by his answer to the court's comprehensive inquiry. Rather the trial court found the juror did not demonstrate or possess any bias or prejudice toward either party as a result of acquiring the extra-judicial information. Furthermore, in making this determination, the trial judge relied upon the totality of the proceedings and not an answer to a "magic question".

Unlike the case now before us, the jurors in *Montgomery* acquired their extra-judicial knowledge before the trial. Thus, the issue there was whether the trial court made the proper decisions in overruling the challenges for cause and not, as it is here, whether the trial court should have declared a mistrial.

Despite the significant differences between the facts of the present case and those in *Montgomery,* the Court of Appeals ruled that juror # 2's mere exposure to "extrajudicial information" legally tainted him and rendered him biased. *Montgomery* provides no authority for this proposition.

In *Montgomery* it was not the exposure to information which disqualified the prospective jurors. There, all prospective jurors in a "small, rural county" had been exposed to "massive and pervasive" news media coverage and some even possessed information inadmissible at trial. Yet possession of this information did not per se disqualify them from jury service. It is the impact exposure to information has upon a person which is determinative, not the mere exposure itself.

*Montgomery* did not reduce the trial court's broad discretion in the jury selection process. Rather it mandated that the discretion be based upon the "totality of circumstances" of the voir dire examination rather than a predictable and unilluminating response to a "magic question". We reversed the conviction in *Montgomery* not because the trial court lacked discretion, but because the trial court abused its discretion.

The latitude accorded a trial judge in assessing a venireperson's qualifications to serve as a juror was reaffirmed in *Mabe v. Commonwealth,* Ky., 884 S.W.2d 668, 671 (1994), where we stated:

> *Montgomery* rejects the idea that a magic question may be asked which can rehabilitate a juror whose answers to voir dire questions demonstrate a pervasive prejudice. On the other hand, *Montgomery* does not eliminate trial court discretion or absolve the trial court of its duty to evaluate the answers of prospective jurors in context and in light of the juror's knowledge of the facts and his understanding of the law.

### TEST FOR THE TRIAL COURT

The goal of our system of justice is fairness, not perfection. We live in an imperfect world and it is unrealistic to expect perfection in the courtroom. Most trials will have "occasional minor or surface knicks which, when cured by the trial court, cause no substantial error". *Stanford v. Commonwealth,* Ky., 734 S.W.2d 781, 791 (1987).

■ The trial court has broad discretion in assessing the impact of extra-judicial information in a variety of settings. Before trial, its decision to deny a motion for change of venue because of pre-trial publicity or other extra-judicial information will be honored unless there is a showing of actual prejudice or if prejudice can be clearly implied. *Montgomery* at 716, citing *Brewster v. Commonwealth,* Ky., 568 S.W.2d 232 (1978). During the jury selection process, the trial court is again invested with discretion to determine, based upon the totality of the circumstances, whether extra-judicial information has infringed upon a prospective juror's "mental attitude of appropriate indifference." *Montgomery* at 718. We see no reason why the manner or legal standard for assessing the impact of extra-judicial information should differ once the jury has been sworn. The trial judge we entrust with this responsibility in earlier stages of the proceedings is still closest to the pulse of the jury and remains the best person to make this determination once the offer of proof has begun.

During the trial in *Deemer v. Finger,* Ky., 817 S.W.2d 435 (1991), a juror, who later became foreperson, discussed the substance of the case with her husband. The trial judge was aware that the juror had acquired extra-judicial knowledge, but did not advise either party and made no inquiry into what the juror had learned or the effect of the information upon her. We reversed and remanded for a new trial because the trial court merely ignored the matter. "[I]n eschewing further inquiry, in condoning the juror's extra-court conversation, and in failing to notify counsel of her remarks," the trial court "committed palpable error." *Id.* at 437. Unlike *Deemer,* here, the trial court made the appropriate inquiry to determine whether to declare a mistrial.

*Byrd v. Commonwealth,* Ky., 825 S.W.2d 272 (1992), decided shortly after *Montgomery,* recognizes the continuing discretion allowed the trial judge in determining the effect of extra-judicial information on jurors. During Byrd's murder trial, despite the

court's admonition, four jurors obtained extra-judicial information by reading part of a newspaper article concerning the proceeding. Byrd moved the court for a mistrial based upon juror misconduct alleging he was prejudiced by the jurors knowing that eight jurors in a previous trial had voted to find him guilty. The trial court overruled Byrd's motion for a mistrial. After being convicted of murder, Byrd appealed.

In affirming Byrd's conviction, we again embraced legal principles which are germane to the case before us. First, juror misconduct only results in a new trial when the misconduct so prejudices a party that a fair trial was not obtained. Second, it is the role of the trial judge, entrusted with broad discretion, to determine the prejudicial effect of juror misconduct—including the impact of extra-judicial information. *Byrd* at 275.

The Court of Appeals reasoning in this case, that once a juror is exposed to extra-judicial information that juror is automatically presumed "legally tainted," robs the trial court of its discretion and deprives our system of justice of the benefit of a great resource—the trial judge. We have far greater confidence that our system of justice will be better served by a flexible standard, carefully administered by the trial judge invested with reasonable discretion, than a mechanical formula clumsily forced upon every situation.

When a juror acquires extra-judicial information during trial, the trial court should inquire into the juror's views in a manner calculated to discover those views. Relying on the totality of the inquiry, rather than on a predictable response to a so-called "magic question," it is within the trial court's sound discretion to determine the effect of the extra-judicial information. The trial court must then determine whether there is a manifest necessity for a mistrial due to an error affecting the substantial rights of the parties where prejudice cannot be otherwise removed. Whether removal of prejudice can be accomplished by a curative admonition or whether a mistrial is necessitated is a matter within the sound discretion of the trial court.

## APPELLATE REVIEW

In this case, the trial court's response to the notification that juror #2 had obtained extra-judicial information was exemplary. The trial judge immediately made a full disclosure to the parties, allowed the parties and counsel adequate time to reflect on the situation, and conducted a thorough examination of each juror in private. After extensive inquiry, the trial court concluded that continued service on the jury by juror #2 did not prejudice the appellant's right to a fair and impartial trial. Even though exposed to extra-judicial information, there was no indication that he had formed an opinion based upon that information.

■ Furthermore, out of a sense of caution, the trial judge gave the jury a detailed curative admonition. There is a presumption that a jury follows such an admonition. *Alexander v. Commonwealth*, Ky., 862 S.W.2d 856, 859 (1993). The trial court requested all jurors to reflect and determine if they would adhere to the admonition and individually polled each juror. All of these actions were performed in an environment which encouraged the full participation of the jury and counsel.

■ The trial judge made a thoughtful determination that a fair and impartial jury was in place prior to commencement of deliberations and that a mistrial was not necessitated. A mistrial should be granted only when no other remedy will provide relief to the moving party. In most instances the prejudicial event can be rectified by a curative admonition.

> [W]hen a [w]ise and experienced judge who presided at the trial and observed the jury, comes to such a conclusion [that extra-judicial information acquired during trial did not necessitate a mistrial], it is not for us to upset it. The trial judge was in a better position than we are to determine whether what happened was prejudicial. *Byrd, supra*, 825 S.W.2d at 275 (citation omitted).

■ After judgment was entered, Charlton and Commercial Pavers moved the trial court for a new trial. This motion was correctly overruled because the record is devoid

of any indication that Charlton and Commercial Pavers were prejudiced by one juror's exposure to the extra-judicial information. Not only is it clear that the trial court appropriately exercised its discretion in overruling the motion for mistrial, it is likewise clear that the trial judge's reasoning and decision were supported by subsequent events. All aspects of the jury verdict were fully supported by the evidence. Furthermore, the affidavits submitted by juror #2 and the foreperson of the jury confirm the trial court's decision. The decision of a trial court to overrule a motion for new trial will not be disturbed on appeal absent a manifest error or abuse of discretion. *Gray v. Sawyer*, Ky., 247 S.W.2d 496 (1952).

The trial court's decisions to overrule the motions for mistrial and a new trial cannot be disturbed absent an abuse of discretion and we find none. Accordingly, the decision of the Court of Appeals is reversed and the judgment of the Gallatin Circuit Court is reinstated.

BAKER, GRAVES, KING, LAMBERT and STUMBO, JJ., concur.

STEPHENS, C.J., concurs in result only.

WINTERSHEIMER, J., concurs by separate opinion.

WINTERSHEIMER, Justice, concurring.

I concur with the result reached by the majority in this case, but I wish to state my views separately.

I fervently hope that this case will put an end to the continuing debate in the legal profession regarding the question of juror disqualification as a result of extra-judicial information received by the juror during the course of the trial. It should be noted in passing that counsel for both appellants and appellees should be complimented on thoughtful and well reasoned arguments.

Two of the cases that seem to have created the most discord among counsel are *Montgomery v. Commonwealth*, Ky., 819 S.W.2d 713 (1991), an unsigned opinion of a fragmented court, and *Thomas v. Commonwealth*, Ky., 864 S.W.2d 252 (1993). In both of these criminal cases, I filed extended dissenting opinions. It is my hope that we can make it clear that *Montgomery, supra*, did not deliberately reduce the sound discretion of a trial judge in the jury selection process. I believe that case stood for the proposition that discretion should be based on the totality of the circumstances rather than a specific routine question. The broad discretion of a trial judge in considering the qualifications of a juror to serve was more clearly established in *Mabe v. Commonwealth*, Ky., 884 S.W.2d 668 (1994).

As I noted in my dissent in *Montgomery*, the sound discretion of a trial judge as to whether a juror should be excluded for cause should not be disturbed unless it is clearly erroneous. *Simmons v. Commonwealth*, Ky., 746 S.W.2d 393 (1988); *See also Jones v. Commonwealth*, Ky.App., 737 S.W.2d 466 (1987).