# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: MARCH 26, 2020
NOT TO BE PUBLISHED

Supreme Court of Kentucky

2018-SC-000658-MR

DATE 5/18/20

SAM CORNETT							APPELLANT

							ON APPEAL FROM CLAY CIRCUIT COURT
							HONORABLE OSCAR G. HOUSE, JUDGE
V.							NO. 16-CR-00033

COMMONWEALTH OF KENTUCKY						APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**AFFIRMING**

A Clay County jury found Sam Cornett guilty of one count of first-degree murder, one count of first-degree fetal homicide, one count of first-degree burglary, and three counts of first-degree wanton endangerment. The jury recommended twenty-five years of imprisonment for each homicide charge, ten years of imprisonment for the burglary charge, and one year of imprisonment for each wanton endangerment charge, to run concurrently, for a total recommended sentence of twenty-five years of imprisonment. This appeal followed as a matter of right. *See* Ky. Const. Section 110(2)(b). Having reviewed the record and the arguments of the parties, we affirm the judgment of the Clay Circuit Court.

# I. BACKGROUND

These charges stem from the shooting death of Alisha Tye and her unborn child. At the time of her death in 2016, Tye was in a romantic relationship with Cornett. They lived together and shared a daughter, Summer, who was roughly two years old at the time of the shooting. Tye was also approximately three months pregnant with another child at that time.

On the evening of April 30, 2016, Tye and Summer left the trailer that they shared with Cornett and walked down the street to the mobile home of Amanda Ross, Cornett's aunt. Amanda shared the home with her adult son, Cody, her adult daughter, Nikita, and her daughter's minor child, Ariana.[1] Amanda testified that Tye and Summer arrived at her home around 7:00 PM. Tye and Summer stayed at Amanda's home for several hours.

Sometime after dark, Cornett came to Amanda's home and knocked on the door. At that time, Tye was in the main room with Summer and Amanda, Nikita was in the hallway, Ariana was asleep, presumably in one of the bedrooms, and Cody was in his bedroom. When no one answered the door, Cornett forced the door open and entered the home while armed with a gun. At some point, Cody came out of his back bedroom, and Cornett knocked him down. Nikita fled to a neighbor's home to call 911, and Tye took Summer and ran to Cody's bedroom. Cornett followed Tye down the hall to the bedroom, where he shot her multiple times. As Cornett began shooting, Amanda and

---

[1] Because these individuals share the same last name, they will be referred to by their first names to avoid confusion.

2

Cody fled the home. After the shooting and before emergency responders arrived, Cornett took Summer, left Amanda's mobile home, and walked to his father's nearby home.

Emergency medical responders arrived on the scene soon thereafter. They found Tye in the back bedroom of Amanda's trailer with gunshot wounds to her head and shoulder. Paramedics transported Tye to University of Kentucky Medical Center. At the time of her arrival, her neurological condition was consistent with brain death. However, doctors detected a fetal heartbeat and provided supportive care to Tye. Later, less than a day after Tye's arrival at the hospital, doctors were unable to detect the fetal heartbeat. Shortly after, Tye's body spontaneously delivered the fetus. The fetus, approximately three months old, was not viable. Tye was pronounced dead on May 1, 2016.

Cornett's jury trial took place on September 19–25, 2018. A Clay County jury ultimately convicted Cornett of one count of first-degree murder, one count of first-degree fetal homicide, one count of first-degree burglary, and three counts of first-degree wanton endangerment. Cornett was sentenced to a total sentence of twenty-five years of imprisonment. This appeal followed as a matter of right.

## II. ANALYSIS

Cornett asserts the following errors on appeal: (1) the trial court erred in denying his motion for a directed verdict on the charge of first-degree fetal homicide; (2) the trial court provided incorrect jury instructions on the charge of first-degree fetal homicide; (3) the trial court erred in denying Cornett's

request for a mistrial based on the alleged collusion of the Commonwealth's witnesses and should have permitted him to cross-examine said witnesses; and (4) the trial court erred in denying Cornett's other motion for a mistrial based on the behavior of Amanda Ross, one of the Commonwealth's witnesses. We address each argument in turn.

## A. The trial court did not err in denying Cornett's motion for a directed verdict on the charge of first-degree fetal homicide.

Cornett first argues that the trial court erred in denying his motion for a directed verdict on the charge of first-degree fetal homicide. He argues that the first-degree fetal homicide statute, Kentucky Revised Statute ("KRS") 507A.020, requires that Cornett intend to cause the death of the fetus or wantonly engage in conduct creating a grave risk of death to the fetus. Cornett argues that he could not have developed the necessary mental state because he did not know that Tye was pregnant. Accordingly, he argues, he was entitled to a directed verdict on this charge. We disagree.

When an appellate court reviews the trial court's decision to deny a motion for directed verdict, that court must consider whether, "under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt" because "only then the defendant is entitled to a directed verdict of acquittal." *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991) (citing *Commonwealth v. Sawhill*, 660 S.W.2d 3, 5 (Ky. 1983)). However, the argument raised by Cornett requires us to first examine the intent requirement of the fetal homicide statute, KRS 507A.020. Because this is a question of statutory interpretation, our review is de novo. *Commonwealth v. Love*, 334 S.W.3d 92,

4

93 (Ky. 2011) (citing *Commonwealth v. McBride*, 281 S.W.3d 799, 803 (Ky. 2009)).

Under KRS 507A.020, a person is guilty of first-degree fetal homicide when, "with intent to cause the death of an unborn child or with the intent necessary to commit an offense under KRS 507.020(1)(a), he causes the death of an unborn child" and in doing so, he was not acting under the influence of extreme emotional disturbance. KRS 507.020(1)(a), in turn, provides that a person is guilty of murder when "[w]ith intent to cause the death of another person, he causes the death of such person or of a third person," and in doing so, he was not acting under the influence of extreme emotional disturbance. Furthermore, under KRS 507A.020(1)(b), a person commits first-degree fetal homicide when he "wantonly engages in conduct which creates a grave risk of death to an unborn child and thereby causes the death of an unborn child." A plain reading of this language indicates that a person is guilty of first-degree fetal homicide when he causes the death of an unborn child (1) with the intent to cause the death of that unborn child; (2) with the intent to cause the death of another person; or (3) by wantonly engaging in conduct which creates a grave risk of death to an unborn child.

Cornett argues that he could not have intended to cause the death of Tye's unborn child because he did not know she was pregnant, nor could he have wantonly engaged in conduct creating a grave risk of death to that unborn child when he did not know of the pregnancy. We need not address Cornett's argument regarding the wanton portion of the statute, however, as a close look

5

at the intentional aspect of the statute will resolve the issue. In other words, Cornett's argument overlooks the remaining way in which one can commit first-degree fetal homicide: by acting "with the intent necessary to commit an offense under KRS 507.020(1)(a)," which in turn requires that the accused "inten[d] to cause the death of another person." Accordingly, under a plain reading of the first-degree fetal homicide statute, it was not necessary that Cornett know of the pregnancy; rather, a reasonable jury could find him guilty of first-degree fetal homicide if they believed that he intended to cause the death of another person, namely, Alisha Tye.

Cornett did not argue at trial, nor on appeal, that there was insufficient evidence to convince a reasonable jury that he intended to cause Tye's death; he argued only that there was insufficient evidence to show his intent to kill the unborn child because there was no evidence that he knew about the pregnancy. The aforementioned intent argument was the only basis for the motion for directed verdict on the charge of first-degree fetal homicide. Therefore, we need not consider whether there was sufficient evidence to convince a reasonable jury of Cornett's intent to cause Tye's death.

For the reasons set forth above, we hold that the trial court did not err in denying the motion for directed verdict on the charge of first-degree fetal homicide.

## B. The trial court did not provide an improper instruction for the charge of first-degree fetal homicide.

Cornett next argues that the trial court erred in providing the following jury instruction on first-degree fetal homicide:[2]

> You will find the Defendant guilty of First-degree fetal homicide under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:
>
> A. That in this county on or about April 30, 2016, and before the finding of the Indictment herein, he killed the unborn child of Alisha G. Tye by shooting Alisha G. Tye with a gun;
>
> AND
>
> B. That in so doing, it was his intent to cause the death of Alisha G. Tye;
>
> AND
>
> C. That when he did so, he was not acting under the influence of extreme emotional disturbance.

Cornett argues that this language failed to properly instruct the jury that his intent had to be directed toward the unborn child. In other words, he reiterates his argument made in Section A above that KRS 507A.020 requires an intent to cause the unborn child's death and argues that this instruction failed to reflect that intent requirement.

In considering this argument, we note that "the trial court has no discretion to give an instruction that misrepresents the applicable law." *Sargent*

---

[2] The jury received separate instructions for first-degree, second-degree, third-degree, and fourth-degree fetal homicide. At trial, Cornett objected to all of these instructions, making the same intent argument for each. On appeal however, he argues only that the first-degree fetal homicide instruction was improper.

7

*v. Shaffer*, 467 S.W.3d 198, 204 (Ky. 2015). Thus, "the content of a jury instruction is an issue of law that must remain subject to de novo review by the appellate courts." *Id.*

As noted above, however, one may be guilty of first-degree fetal homicide if he causes the death of an unborn child "with the intent necessary to commit an offense under KRS 507.020(1)(a)," which in turn requires that the accused "inten[d] to cause the death of another person." This intent option is reflected in the above-recited instruction, as it states that Cornett caused the death of Tye's unborn child by shooting Tye with a gun, and that he shot Tye with the intent to cause her death.

Accordingly, this instruction does not misrepresent the applicable law, and the trial court did not err in providing this instruction.

## C. The trial court did not err in denying Cornett's request for a mistrial based on the alleged collusion of the Commonwealth's witnesses, nor did the trial court err in failing to provide additional relief.

Cornett next argues that the trial court erred in denying his motion for mistrial, which he made after learning that two of the Commonwealth's witnesses, Amanda and Nikita, had been discussing their testimony with Cody, who was also scheduled to testify for the Commonwealth. Cornett argues that the improper collusion of these witnesses required the trial court to grant his motion for mistrial, or, at the least, allow him to cross examine each of those witnesses about the alleged collusion. For the reasons set forth below, we find no abuse of discretion.

8

KRE 615 governs the exclusion of witnesses during a trial. That rule provides that, upon a party's request or the court's own motion, "the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses." In reference to a former version of this rule, this Court explained,

> The reason for the adoption of the rule is to prevent the witnesses excluded from hearing the testimony of other witnesses with the possible result that the testimony of the others might lead the witness to answer in such manner as to conform with other testimony, even though, as is often the case, the witness herself is not conscious of this subtle influence.

*Speshiots v. Coclanes*, 224 S.W.2d 653, 656 (Ky. 1949) (referencing Section 601 of the Civil Code of Practice).

This Court has acknowledged that "[t]he rule makes separation in the courtroom mandatory, but makes no mention of witnesses interacting outside the courtroom." *Woodard v. Commonwealth*, 219 S.W.3d 723, 728 (Ky. 2007), overruled on other grounds by *Commonwealth v. Prater*, 324 S.W.3d 393 (Ky. 2010). If a witness disobeys a witness-separation order, enters the courtroom, and hears testimony, "[t]he trial court has discretion to take corrective measures," including holding the disobedient witness in contempt and disallowing his or her testimony entirely. *Id.*; *see also McGuire v. Commonwealth*, 368 S.W.3d 100, 113 (Ky. 2012) (finding trial judge's remedy of excluding witness's testimony from penalty phase to be consistent with KRE 615). However, when witnesses coordinate their testimony *outside* the courtroom, we have suggested that "[t]he best course is to allow the testimony

9

subject to proper impeachment on cross examination." *Woodard*, 219 S.W.3d at 728–29. Still,

> [w]e have traditionally afforded "the trial judge broad discretion in the matter of permitting or refusing to permit the testimony of a witness who has violated the rule of separation, and have refused to intervene in such matters except in cases where that discretion is found to have been abused."

*Commonwealth v. Collins*, 933 S.W.2d 811, 817 (Ky. 1996) (quoting *Jacobs v. Commonwealth*, 551 S.W.2d 223, 225 (Ky. 1977)).

A mistrial, however, is "universally agreed" to be "an extreme remedy." As such, a mistrial

> should be resorted to only when there is a fundamental defect in the proceedings which will result in a manifest injustice. The occurrence complained of must be of such character and magnitude that a litigant will be denied a fair and impartial trial and the prejudicial effect can be removed in no other way.

*Gould v. Charlton Co., Inc.*, 929 S.W.2d 734, 738 (Ky. 1996) (citations omitted).

Accordingly, "a trial court's decision to deny a motion for mistrial will not be disturbed absent an abuse of discretion." *Maxie v. Commonwealth*, 82 S.W.3d 860, 863 (Ky. 2002) (citing *Gould*, 929 S.W.2d at 741). For example, in *Woodard*, the trial court acted within its discretion in denying the two defendants' motions for mistrial, which had been based on out-of-court interactions between two witnesses. The two witnesses had shared a ride to court, but they denied discussing their testimony. The trial court ultimately allowed the witnesses to testify, subject to impeachment on cross-examination. We held that this was not an abuse of discretion. *Woodard*, 219 S.W.3d at 729.

In this case, defense counsel asked to separate witnesses on the first day of trial, prior to the presentation of the Commonwealth's case-in-chief. The trial court then asked the witnesses to leave the courtroom; he did not direct them to refrain from discussing their testimony, and neither party sought such an instruction. During the Commonwealth's case-in-chief, both Amanda and Nikita testified about the night of the shooting. Later, the parties conducted a bench conference with the court to discuss the Commonwealth's remaining witnesses. The Commonwealth's Attorney explained that he had some concerns about whether Cody would be competent to testify because Cody could not remember anything that happened on the night of the shooting. To determine whether Cody was competent, the court allowed Cody to take the stand and be examined under oath outside the presence of the jury.

During this testimony, Cody claimed that he could not remember the shooting. He explained that he has a "very bad memory" and had completely blocked out the traumatizing event. He also testified that he had previously asked his mother, Amanda, "a few questions about what happened because I wanted to know." When asked if he had spoken to her about it recently, he responded that Amanda asked him the night before whether he could remember anything, but Cody told her no, he could not remember. He also testified that Nikita had spoken to him about her testimony. More specifically, Nikita told Cody that the attorneys had asked about a bottle of pills that had been found in Cody's room. When defense counsel heard this, he asked, "So you all have been discussing your testimony back here in the back room,"

11

referring to the room in which the Commonwealth's witnesses were gathered. Cody replied, "Was [sic] we not allowed to do that?" Defense counsel did not inquire further and instead stated that he had no more questions. After Cody left the stand, the judge ruled that Cody was incompetent to testify.

Defense counsel then moved for a mistrial on the basis that the witnesses had been discussing their testimony and "orchestrating their testimony the whole way through" the trial. The trial court stated, "I don't think that I will grant the motion based on the statement of the incompetent witness." This ended the discussion of a potential mistrial, and defense counsel then began arguing that Cody was competent and should be allowed to testify. He argued that he should be allowed to call the KSP Trooper that interviewed Cody on the night of the shooting to testify about those statements if Cody claimed he could not remember the events of that night. The court restated its previous ruling that Cody was incompetent to testify, and the parties began to discuss whether an incompetent witness's prior out-of-court statements could be admitted. At no point during this discussion did defense counsel ask for any other remedy to address the alleged witness collusion. Cody's statements on the night of the shooting were eventually played for the jury.

Under these circumstances, we do not believe that the denial of Cornett's motion for mistrial constituted an abuse of discretion. First, as noted above, a mistrial is an extreme remedy, warranted only when manifest injustice will result from a fundamental defect in the proceedings. In this case, defense counsel claimed that the Commonwealth's witnesses—namely, Amanda, Nikita,

12

and Cody—had been "orchestrating" their testimony during trial. However, there is no evidence of such collusion. At most, Cody's testimony shows that (1) Amanda asked Cody if he was able to remember anything, to which he responded no, and (2) Nikita had mentioned to Cody that she was asked about the pills in Cody's room. Both of these discussions occurred after Amanda and Nikita had testified, and neither discussion could have affected Cody's testimony, as he was found incompetent to testify.

Cornett argues, however, that Amanda and Nikita's testimonies both conveniently omit Cody's initial recollection of the events, which he recounted for officers in his recorded statement on the night of the shooting. We note, however, that each of these witnesses provided their *own* accounts of the events of that night. We cannot find collusion merely because Amanda and Nikita did not also testify regarding what another person witnessed. Furthermore, the fact that each witness's description of events differs somewhat tends to demonstrate a *lack* of collusion, rather than any orchestrated attempt to provide similar stories. Lastly, we note that, to the extent Cornett may be suggesting that Amanda, Nikita, and Cody were colluding to keep Cody's initial recollections off the record, those very statements were played for the jury after Cody was found incompetent to testify.

In addition, we find this case distinguishable from *Mills v. Commonwealth*, 95 S.W.3d 838 (Ky. 2003), a case relied on by Cornett. In that case, the court improperly allowed an eyewitness to the crime to stay in the

13

courtroom during the trial. Prior to the eyewitness's testimony, the investigating officer took the stand, gave a detailed explanation of the eyewitness's statements, and provided other specific details of the crime. We noted that, by the time the eyewitness took the stand, his memory had been "completely refreshed." *Id.* at 841. Because he was the only eyewitness to the crime, "his overall credibility was crucial to the Commonwealth's case," and he should not have been permitted to hear the other witnesses' testimony. *Id.* In this case, there are three eyewitnesses—Amanda, Nikita, and Cody—and there is no evidence that their out-of-court discussions influenced their testimony in any way.

Furthermore, while Cornett now complains that the trial judge should have permitted him to examine the witnesses about the alleged collusion, he made no such request at trial. We cannot hold that the trial judge abused his discretion in this regard, when defense counsel made no such motion or request.

Accordingly, the trial court did not err in denying Cornett's motion for a mistrial based on the alleged collusion or in failing to *sua sponte* provide additional relief, such as cross-examination.

## D. The trial court did not err in denying Cornett's request for a mistrial based on Amanda Ross's behavior.

Lastly, Cornett argues that the trial court erred in denying a motion for mistrial made after Amanda had an apparent seizure at the conclusion of her testimony. Cornett argues that the apparent seizure, combined with Amanda's emotional testimony, worked to arouse the jury's sympathies and was so

14

prejudicial that the jury was unable to follow the trial court's admonition to disregard Amanda's apparent seizure. For the reasons set forth below, we find no abuse of discretion.

Amanda testified on behalf of the Commonwealth. Throughout her testimony, Amanda was emotional and cried often. When her testimony ended, Amanda stood to leave the witness box. As she was stepping down, she fell to the floor and began having what appeared to be a seizure.[3] Approximately fifty seconds after Amanda fell to the floor, the judge began to address the jury and the courtroom recording equipment was turned off. Though it is unclear, it appears that the judge directed the jury to leave the courtroom. About ten minutes later, the recording began again, with all parties and the jury present in the courtroom. The judge explained to the jury that Amanda suffered a seizure, fell and hit her head, and, in the jury's absence, was removed by EMTs for medical treatment. The trial court then adjourned for the day.

After the jury was released, defense counsel moved for a mistrial on the basis that Amanda's episode likely engendered sympathy from the jury. He also noted that the seizure occurred immediately following his cross examination, and the jurors might feel animosity toward Cornett if they believed that the seizure resulted from defense counsel's efforts to cross-examine Amanda. The

---

[3] The courtroom recording of these events does not show Amanda after she leaves the witness stand, though it does show a deputy jumping up and then kneeling down on the floor to assist Amanda as another woman in the courtroom also comes to Amanda's assistance. In their briefs to this Court, however, the parties both describe Amanda as leaving the witness stand, falling to the floor, and having what appeared to be a seizure. The deputy that first assists Amanda also relays through his radio that she is having a seizure.

15

judge denied the motion but said he would "make an inquiry of the jury." Court was then recessed for the weekend.

Defense counsel then filed a written motion in which he requested permission "to call as [the defendant's] witnesses the EMT's who attended Amanda Ross immediately after the conclusion of her testimony on September 20, 2018 to report to the jury their assessment, treatment and handling of the patient Amanda Ross after they retrieved her from the courtroom." In support, defense counsel explained that Amanda and her son had been seen standing outside the courthouse shortly after her collapse, and they had walked away, presumably walking on foot to their home. Defense counsel suggested, "without necessarily asking the Court to adopt the suggestion, that Amanda Ross' [sic] collapse was yet more of her melodramatic presentation to the jury, undoubtedly intended to both prejudice the Defendant and engender unwarranted sympathy."

The motion was addressed outside the presence of the jury on the next day of trial. The trial judge denied the motion[4] but stated that he would provide an admonition to the jury "concerning the situation." The judge asked the attorneys if they had any suggestions for what the admonition should contain. Defense counsel stated that he had wanted to call the EMTs to explain to the jury that Amanda was coherent when the EMTs arrived and she refused

_____

[4] On appeal, Cornett does not challenge the trial court's denial of his motion to call the EMTs as witnesses; he argues only that the trial court erred in denying his motion for mistrial.

16

medical treatment and walked home. The Commonwealth assented to this information being provided to the jury in the form of an admonition. When the jury returned to the courtroom, the trial judge made the following statement:

> Ladies and gentlemen of the jury, at the close of, or close to the close of business on Thursday, the last witness that testified was on the stand for quite a long time on direct and on cross and as she left the stand she either had a seizure or tripped or, anyway, she ended up on the floor, and I placed the jury into the jury room, and the court security officers called the EMTs and they came and removed Ms. Ross on a stretcher. At the time she was removed, she had more or less recovered herself, by the time they put her on the stretcher and left the building, and told the EMTs that she did not need to go to the hospital for eval—that she was okay, that she just had a mild episode and that she refused any treatment and waited outside and met her son and they walked home. What I want to say to you is that you are admonished that nothing about her collapse or removal or anything, does not have anything to do with what you think or what you heard. You should not use that in any way either for the Commonwealth, against the Commonwealth, for Mr. Cornett, or against Mr. Cornett. It's just something that happened and I assure you that it was not because of the vigorous direct examination or the vigorous cross examination, it's just something that occurred, and if you cannot disregard that, I would like to know at this time, if that's going to have some effect on your decision in this case, because you swore that you'd take the proof that was given on the witness stand. So, does anybody got a problem? You can disregard that little episode and put it aside and have no, anything be held against Mr. Cornett or anybody else because of what happened to Ms. Ross?

The trial judge then stated, "I take it by your silence that you agree with that and will do that, alright, you're nodding your heads yeah, alright, thank you very much."

As noted above, a mistrial is an extreme remedy, and a motion for a mistrial should be granted only "when there is a fundamental defect in the proceedings which will result in a manifest injustice." *Gould*, 929 S.W.2d at 738 (citations omitted). Thus, "for a mistrial to be proper, the harmful event

17

must be of such magnitude that a litigant would be denied a fair and impartial trial and the prejudicial effect could be removed in no other way." *Maxie*, 82 S.W.3d at 863 (citing *Gould*, 929 S.W.2d at 738). However, "[a]bsent bad faith, an admonition given by the trial judge can cure a defect in testimony." *Alexander v. Commonwealth*, 862 S.W.2d 856, 859 (Ky. 1993) (citations omitted), *overruled on other grounds by Stringer v. Commonwealth*, 956 S.W.2d 883 (Ky. 1997). We presume that a jury will follow a trial court's admonition, "unless (1) there is an overwhelming probability that the jury will be unable to follow the court's admonition; and (2) a strong likelihood that the effect of the inadmissible evidence would be devastating to the defendant." *Id.* (citing *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987)).

In this case, the judge provided a lengthy and detailed admonition to the jury. The admonition contained the information requested by defense counsel—that Amanda had refused medical treatment and walked home. The judge specifically asked the jury if they would be able to disregard Amanda's episode and not hold it against Cornett or the Commonwealth. No juror expressed any doubt as to whether they could do so, and the trial judge accepted their silence and head-nodding as affirmation that they could follow his admonition. Under these circumstances, we do not believe there was an "overwhelming probability" that the jury would be unable to follow the court's admonition and "put aside" the medical episode suffered by Amanda.

Furthermore, we do not believe that the jury's viewing of Amanda's episode carried "a strong likelihood" of being "devastating to the defendant." *Id.*

18

At trial, defense counsel argued that the timing of the seizure—immediately following cross-examination—would cause animosity toward Cornett, as the jury might blame defense counsel's vigorous questioning.[5] However, Amanda was emotional throughout her entire testimony, including direct examination by the Commonwealth. Her episode occurred after she stepped down from the witness stand; it did not occur in direct response to any action or statement of defense counsel. In addition, while we acknowledge that a witness's medical condition may, in certain cases, arouse some sympathy from the jury, there is no evidence in this case that the jury's verdict was in any way affected by the viewing of Amanda's seizure. Rather, the evidence against Cornett, including his statements to police and the testimony of eyewitnesses, was overwhelming. Under these circumstances, we cannot say that there was "a strong likelihood" that Amanda's episode was "devastating" to Cornett.

Because we do not believe there was an "overwhelming probability" that the jury would be unable to follow the admonition nor a "strong likelihood" that the seizure was devastating to Cornett, we presume that the jury followed the trial court's admonition. *Alexander*, 862 S.W.2d at 859 (citing *Greer*, 483 U.S. at 766 n.8). We therefore conclude that Amanda's seizure was not of "such magnitude that a litigant would be denied a fair and impartial trial and the

___

[5] Before this Court, Cornett argues that Amanda's emotional testimony, combined with the seizure, amounted to improper victim-impact evidence. We note, however, that Cornett did not raise this argument to the trial court; he argued only that the seizure would arouse sympathy for Amanda and animosity toward Cornett. Accordingly, we do not consider this new argument. *Springer v. Commonwealth*, 998 S.W.2d 439, 446 (Ky. 1999) (explaining that "[a] new theory of error cannot be raised for the first time on appeal").

19

prejudicial effect could be removed in no other way." *Maxie*, 82 S.W.3d 860 at (citing *Gould*, 929 S.W.2d at 738). Thus, the jury's viewing of Amanda's seizure did *not* amount to a fundamental defect resulting in manifest injustice, and the trial court did not err in denying Cornett's request for a mistrial based on Amanda's behavior.

## III. CONCLUSION

For the reasons set forth above, we hereby affirm the judgment of the Clay Circuit Court.

All sitting. All concur.


COUNSEL FOR APPELLANT:

Steven Goens
Assistant Public Advocate
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

Leilani K.M. Martin
Assistant Attorney General