RENDERED:  MAY 7, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-1803-MR

JASON BOWLES                                                    APPELLANT

APPEAL FROM WARREN CIRCUIT COURT
v.          HONORABLE STEVE ALAN WILSON, JUDGE
ACTION NO. 18-CR-00363

COMMONWEALTH OF KENTUCKY                                        APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  GOODWINE, JONES AND KRAMER, JUDGES.

KRAMER, JUDGE:  On March 28, 2018, Jason Bowles was indicted in Warren

Circuit Court on two charges of first-degree rape[1] and one charge of first-degree

sexual abuse by forcible compulsion[2] against his second-cousin, A.C., a minor.

---

[1] *See* Kentucky Revised Statute (KRS) 510.040(1)(a).

[2] KRS 510.110(1)(a).

Following a jury trial, Jason was ultimately convicted of one charge of rape, as well as the charge of sexual abuse, and he was consequently sentenced to eleven years' imprisonment pursuant to a final judgment of November 12, 2019. Jason now appeals, asserting he was entitled to a directed verdict due to insufficient evidence; a mistrial due to what he believes was the impermissible admission of prior bad acts evidence against him; or that he is entitled to a new trial due to various other evidentiary errors discussed below. Upon review, we affirm.

This matter involves a roughly two-month period between the end of December 2015 and the beginning of February 2016 when Jason, his wife Holly, and his two young daughters moved from Alabama to temporarily reside with the family of Jason's cousin, R.G. R.G. lived in a four-bedroom house with her husband, Chris; her then-thirteen-year-old daughter and the victim herein, A.C.; her daughter, N.G., who was eleven years old at the time; and her son, J.G., who was then about five years old. While they were there, Jason and his family slept in A.C.'s bedroom, and A.C. slept on the couch in the family room. On or about January 20, 2016, however, Holly left R.G.'s house with Jason's two daughters and went to live at her mother's house; Jason slept on the couch; and A.C. returned to sleeping in her own bedroom. In early February of that year, Jason then left R.G.'s house to resume living with his wife and daughters, and they left Kentucky.

The charges in this matter stemmed from A.C.'s allegations that Jason began raping and sexually assaulting her shortly after Jason's daughters and Holly left the home on January 20, 2016. According to A.C., the first rape – and the focus of Count I of the indictment – occurred in her bedroom in the early morning hours on a date between January 20 and January 25. To summarize her recollection of the event, her room was dimly illuminated only by her television set, which she kept on at night to help her sleep. She awoke when Jason came into her room, walked over to her bed, and unbuckled his pants. He pulled the covers off her, pulled her pants down, scooted her to the edge of the bed, and put what she believed was his penis inside of her. When Jason started to take his pants down, A.C. said, "no, stop." Jason put his hand over her mouth, told her it was "okay," and held his hand there the entire time. A.C. recalled being scared and that it "hurt really bad." She alleged she told no one about the incident, at least not immediately after it occurred, because Jason threatened to hurt her if she did.

The sexual abuse – and the focus of Count II of the indictment – allegedly occurred late on January 26, 2016. On that date, R.G. had gone to the emergency room and was spending the night at the hospital after experiencing chest pains at work. Around midnight, she telephoned A.C., asking A.C. to bring her a blanket and some clothes and to have Jason give her a ride there. After they brought her things, along with food from Waffle House, R.G. asked A.C. to stay

with her overnight.  However, Jason offered to bring A.C. back to the hospital the following morning, and he and A.C. left.  According to A.C., and as discussed in more depth below, Jason then sexually abused her in his truck on the drive home.

The second rape – and the focus of Count III – allegedly occurred on January 27, 2016, when Jason and A.C. returned from the hospital around 3:00 or 4:00 a.m.  This incident is likewise discussed in more depth below.

In April 2017, A.C. informed R.G. of these three incidents.  R.G. contacted the authorities. Following an investigation, Jason was indicted as set forth above.  He was eventually arrested on June 27, 2018.  And, following a jury trial from September 11, 2019 through September 13, 2019, the jury acquitted Jason of Count I, but convicted him of Counts II and III.  This appeal followed.

## I.  DIRECTED VERDICT

We begin with Jason's assertion that he was entitled to a directed verdict on Counts II and III due to insufficient evidence.  In *Commonwealth v. Benham*, 816 S.W.2d 186 (Ky. 1991), the Kentucky Supreme Court delineated the standard for handling a criminal defendant's motion for a directed verdict as follows:

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on

the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

*Id*. at 187 (citing *Commonwealth v. Sawhill*, 660 S.W.2d 3 (Ky. 1983)). *See also Norris v. Commonwealth*, 89 S.W.3d 411, 416 (Ky. 2002). The standard for appellate review of a denial of a motion for a directed verdict alleging insufficient evidence dictates that if under the evidence as a whole it would not be clearly unreasonable for a jury to find the defendant guilty, he is not entitled to a directed verdict of acquittal. *Benham*, 816 S.W.2d at 187; *Holbrooks v. Commonwealth*, 85 S.W.3d 563, 569 (Ky. 2002).

In this vein, Jason notes that Counts II and III each required the jury, as instructed, to find that he raped or sexually abused A.C. through "forcible compulsion." His argument is that no such evidence was adduced. In his brief, he describes the extent of the evidence relevant to those claims, which he deems inadequate in this regard, as follows:

> AC testified about two incidents that happened in the early morning hours on January 27, 2016. The first which was the basis of the sex abuse conviction allegedly happened in [Jason's] truck on the way back from the hospital after bringing AC's mother food, clothing and a blanket. AC testified he started tugging at her pants. AC said she told [Jason] to leave her pants alone. He told her to lay down and she said no but he said it more aggressively and "I was scared of him; so I lay down with my head in his lap and my feet toward the passenger door. He pulled my pants down and started to put his

-5-

fingers inside me." She said she was not going to do anything so he just kept putting his finger inside her. She did not try to get away because she knew that he was bigger than her and could make her do whatever. She realized at some point they were in back roads and she got mad and told him to take her home.

When they got home, AC testified she yelled at him outside and hit him, and he was getting upset saying "stop", "let's go inside", "the neighbors were going to hear." AC got really angry, slammed the door and stomped to her room. [Jason] pulled her out of her bed and kind of dragged her to the couch and said she was sleeping there because he was really tired. She did not feel like fighting any more. She woke up on the couch to find her pants were down and [Jason] was getting on the couch with her. He was laying on the opposite way with his legs towards her, and he "scooted down" and put his penis inside her. AC explained she did not remember a whole lot from that time probably because she had just woken up and was still kind of asleep. She did not remember how long it lasted. She did not say anything to him when he was doing this on the couch because at that point she did not feel like fighting with him or anything.

(Internal record citations omitted.)

However, Jason's recitation of the evidence omits salient details and warrants further elaboration. We begin by noting that his discussion of the evidence is limited to "the early morning hours on January 27, 2016." His assumption appears to be that because the jury found him "not guilty" of Count I – which asked the jury to determine whether he had committed first-degree or second-degree rape against A.C. on one occasion between January 20, 2016, and January 25, 2016 – the jury was therefore estopped from considering any evidence

-6-

from January 20, 2016 through January 25, 2016 in conjunction with Counts II and III.

However, there is no such rule of estoppel. To the contrary, "[c]redibility and weight of the evidence are matters within the exclusive province of the jury." *Commonwealth v. Smith*, 5 S.W.3d 126, 129 (Ky. 1999) (citations omitted). And, jurors are free to believe parts and disbelieve other parts of the evidence including the testimony of each witness. *Id*. In other words, it is true that within the meaning of the instructions provided, the jury found reasonable doubt regarding A.C.'s claim that Jason raped her on an occasion between January 20, 2016, and January 25, 2016. But, nothing precluded the jury from inferring from the evidence that inappropriate sexual conduct apart from what had been charged had indeed occurred in that timeframe; and, likewise, nothing precluded the jury from lending credence to A.C.'s testimony regarding what happened *after* it occurred, and *prior* to January 27, 2016:

> COMMONWEALTH: After the night that he came in your room, what happened the next day, if you remember?
>
> A.C.: I tried to kind of stay away from him.
>
> COMMONWEALTH: Did he say anything to you about this after that night?
>
> A.C.: He told me that if I told anyone that he would hurt me and that, um, I knew that if I told anyone, that he would go to jail and that he didn't want that.

COMMONWEALTH:  And did you believe him, that he would hurt you?

A.C.:  Yes.

In sum, A.C. testified that shortly before January 27, 2016, Jason had threatened her with physical harm if she told anyone about his illicit conduct toward her.  A.C. testified she believed his threat, particularly considering their difference in size and strength; as Jason himself concedes, "he was bigger than her and could make her do whatever."[3]  And, during cross examination, A.C. testified Jason's threat of harm had a continuing effect upon her:

DEFENSE:  I don't know.  Really?  If someone really brutalized you and raped you, you wouldn't get anywhere near him, would you?

A.C.:  I was scared of him.

DEFENSE:  So, you're so scared of him that you put yourself in his truck?

A.C.:  If I started acting funny around him, somebody would've noticed I was acting funny around him and he threatened me if I told someone.

The jury was permitted to view the evidence regarding Jason's actions during Counts II and III in conjunction with, rather than divorced from, the

_____

[3] When A.C. testified on September 12, 2019, she was seventeen years old and 5'3" tall.  She testified that in January 2016, when she was thirteen years old, "I was not as tall back then, and I was not 100 pounds."  By contrast, Jason testified that in January 2016, when he was 36 years old, he "probably weighed 178 pounds" and was 6'3."

evidence of Jason's prior threat of harm toward A.C. With that in mind, we turn to more of the specifics of A.C.'s testimony regarding Count II:

> COMMONWEALTH: When you were in the truck, did you say anything while he was touching you?
>
> A.C.: Yes. I told him that I didn't want him to do it, that I didn't know why he was doing it.
>
> . . .
>
> COMMONWEALTH: When you were in the truck and you said he was touching you, do you think his finger went inside of you?
>
> A.C.: Yes.
>
> COMMONWEALTH: Was that inside of your vagina?
>
> A.C.: Yes.
>
> COMMONWEALTH: When this was happening, do you remember if he said anything to you?
>
> A.C.: He had asked me to do stuff to him, and I said no, and he got upset. But I, I wasn't going to do anything. And so, he just kept putting his finger inside me.
>
> COMMONWEALTH: Did you try to get away?
>
> A.C.: Not much, that time, because I knew that he was bigger than me and he could make me do whatever.

Furthermore, regarding Count III, it is a mischaracterization for Jason to represent A.C. testified that, during the encounter, "[s]he did not say anything to him when he was doing this on the couch because at that point she did not feel like

fighting with him or anything." Rather, her specific testimony on that point was as follows:

> COMMONWEALTH: When he was doing these things on the couch, did you say anything to him?
>
> A.C.: No.
>
> COMMONWEALTH: Why not?
>
> A.C.: Because at that point, I didn't feel like fighting *would do* anything.

(Emphasis added.)

The element of "forcible compulsion" relevant to the charged offenses at issue in this matter is defined in KRS 510.010(2) as follows:

> [P]hysical force or threat of physical force, express or implied, which places a person in fear of immediate death, physical injury to self or another person, fear of the immediate kidnap of self or another person, or fear of any offense under this chapter. Physical resistance on the part of the victim shall not be necessary to meet this definition[.]

Furthermore, "forcible compulsion" does not require violence or duress or resistance by the victim. *Gibbs v. Commonwealth*, 208 S.W.3d 848, 856 (Ky. 2006) (discussing statutory amendments in 1988 and 1996 eliminating any requirement that the victim resist her attacker and holding that, in that case, the defendant's "act of taking [the victim's] hand and placing it on his penis" satisfied the physical force element, at least for the purpose of a directed verdict motion).

-10-

*See also Gordon v. Commonwealth*, 214 S.W.3d 921 (Ky. App. 2006) (holding that testimony to the effect that the defendant pushed and held apart the twelve-year-old victim's legs in the course of sodomizing her satisfied, for directed verdict purposes, the "forcible compulsion" requirement). Here, considering this precedent, or alternatively considering the evidence through the lens of what A.C. testified was her continued fear created by Jason's threat of harm prior to those two episodes, a reasonable juror who believed A.C.'s testimony to be credible could have concluded that Jason sexually abused and later raped A.C. by forcible compulsion as set forth in Counts II and III. Accordingly, we find no error in the trial court's refusal to grant Jason a directed verdict in those respects.

## II. MISTRIAL

Next, Jason argues the trial court erred by failing to declare a mistrial based upon what he asserts was the cumulative prejudicial effect – which he believes was evinced by a question from the jury during its deliberations – of three testimonial statements from two witnesses. The first two of these statements are italicized below and occurred during the Commonwealth's direct examination of R.G., A.C.'s mother:

> COMMONWEALTH: [R.G.], I know that you said you have three children. Have you ever talked to your children about the difference between, like, a "good" touch and a "bad" touch?
>
> [R.G.]: Yes.

-11-

COMMONWEALTH:  And have any of your kids ever told you that they were touched in a bad way?

[R.G.]:  Yes.

DEFENSE:  I'm gonna object, your honor.

COURT:  Are we talking about [A.C.]?

COMMONWEALTH:  Yes.

COURT:  Is she gonna testify?

COMMONWEALTH:  She is.

COURT:  I'll overrule it.[4]

COMMONWEALTH:   Um, which one of your children was it who told you that?

[R.G.]:  [A.C.]

COMMONWEALTH:  And do you remember when that was that she told you?

---

[4] In an unrelated argument, Jason asserts he is entitled to a new trial because, in his view, what R.G. related regarding what A.C. *told her* about how he had "touched" A.C. "in a bad way" qualified as inadmissible hearsay and improper corroboration of A.C.'s version of events.  We disagree.  R.G. did not relate this statement to prove the *truth* of the matter asserted (*i.e.*, that Jason *did* touch A.C.); indeed, she repeatedly testified during her examination that she had no personal knowledge regarding the truth of anything A.C. related to her regarding her alleged encounters with Jason.  Rather, A.C.'s delay in telling anyone about her alleged encounters with Jason until early 2017 was a point of issue in this matter; and, from the context of this exchange, it is evident R.G. related A.C.'s statement to illustrate why the police were not contacted about this matter until early 2017 – a non-hearsay purpose.  Moreover, as the trial court indicated when overruling Jason's objection as set forth above, R.G.'s testimony was at worst merely cumulative of A.C.'s properly-admitted testimony, and thus harmless error.  *See* Kentucky Rule of Criminal Procedure (RCr) 9.24.

-12-

[R.G.]: It was back, I don't remember exactly when she told me, like, exact date or anything like that, I'm not good with dates, so, but I don't remember no exact date.

COMMONWEALTH: Do you remember if it was the summertime or wintertime?

[R.G.]: It was, it was cold. She told me, I didn't smoke in my house. She came out to the garage where I was smoking, which I have a heater out there, so I was sitting in front of my heater, so I'm assuming it was cool.

COMMONWEALTH: And what did she, who did she tell you had done this to her?

[R.G.]: Jason.

COMMONWEALTH: And did she give you a time that it had occurred?

[R.G.]: She had told me when he first had touched her, and then –

DEFENSE: Objection. Never mind.

[R.G.]: She proceeded to go on about more that had happened and what all he had done.

COMMONWEALTH: Um, do you think that that was in 2017, do you remember how old [A.C.] was at that time?

[R.G.]: Yeah, it was probably about 2017.

COMMONWEALTH: Okay. And did she give you a time of when it had happened, if it had been –

[R.G.]: She, *the first initial touch, she told me what, like, there was a birthday party that day*.

COMMONWEALTH: Okay, so –

-13-

DEFENSE: Objection, your honor. May we approach?

COURT: Yes.

. . .

COMMONWEALTH: What was the next thing she told you happened, or when, I guess?

[R.G.]: *The day that she told me it had first initially, like when he first physically touched her was –*

COMMONWEALTH: Let's stay away from that and talk about –

DEFENSE: Your honor, objection. May we approach?

COURT: Sure.

The third testimonial statement Jason found objectionable is italicized below and occurred during the Commonwealth's direct examination of Andrew Sikes,[5] A.C.'s former boyfriend:

COMMONWEALTH: When you all were dating, was there ever a time that [A.C.] shared something bad that had happened with her?

SIKES: Yes.

COMMONWEALTH: Um, who did she tell you did those things?

SIKES: Jason Bowles.

---

[5] Throughout their respective briefs, Jason and the Commonwealth continuously refer to this witness as "Andrew *Sykes*."

COMMONWEALTH: And what did she tell you happened?

SIKES: Uh, he told, she told me that he started out by touching her, and then it eventually moved –

DEFENSE: Objection, your honor.

COURT: Go ahead. You may continue.[6]

---

[6] Jason raises another argument in roughly the same vein as what is set forth in Note 4, *supra*, relating to the trial court's overruling of his objection to Sikes's statements that A.C. told him Jason "started out by touching her, and then it eventually moved . . . to him coming in her room in the middle of the night and raping her." Additionally, he takes issue with (despite having raised no contemporaneous objection to) similar testimony Sikes later provided on direct examination:

> COMMONWEALTH: Andrew, did [A.C.] tell you during your relationship about two incidents of rape that happened to her?
>
> SIKES: Yes, she did.
>
> COMMONWEALTH: And when she told you these things, what was your response?
>
> SIKES: Well, I was kind of speechless at first. I really didn't know how to respond. It was more consoling her than anything.
>
> COMMONWEALTH: Did you encourage her to tell other people that this happened?
>
> SIKES: I did.
>
> COMMONWEALTH: And do you think that she did that?
>
> SIKES: She did. She ended up going to her mom right after that.

Jason asserts he is entitled to a new trial because, in his view, what Sikes related regarding what A.C. *told him* qualified as inadmissible hearsay and improper corroboration of A.C.'s version of events. We disagree. Sikes did not relate these statements to prove the *truth* of the matter asserted; indeed, he repeatedly testified during his examination that he had no personal knowledge regarding the truth of anything A.C. related to him regarding her alleged encounters with Jason. Once again, we reiterate that A.C.'s delay in telling anyone about her alleged encounters with Jason until early 2017 was a point of issue in this matter; and, from the context of this exchange, it is evident Sikes related A.C.'s statement to illustrate why the police were not

-15-

COMMONWEALTH:  You're good.  Answer the question.

SIKES:  Uh, and it moved to him coming in her room in the middle of the night and raping her.

COMMONWEALTH:  And did she tell you that there was another incident that happened as well?

SIKES:  *Um, in a different county*.

COMMONWEALTH:  Okay –

DEFENSE:  Your honor, objection.

COURT:  Approach.

As to the jury's question, which Jason believes evinced the

cumulative prejudicial effect of the statements italicized above, it was addressed in

the following bench conference with the Commonwealth and the defense:

COURT:  This is jury question number three, from that, they have written, they said "the instructions provide a range of dates for the first incident that were different," uh, "that were provided in the testimony.  Can you provide the date of the first incident?"  My response would be, "No, please determine from the evidence." Anybody object to that going back as the answer?

COMMONWEALTH:  No.

DEFENSE:  No, your honor.

---

contacted about this matter until early 2017 – a non-hearsay purpose.  Moreover, as the trial court's perfunctory overruling of Jason's objection tends to indicate, Sikes's testimony was at worst merely cumulative of A.C.'s properly-admitted testimony, and at most harmless error.  *See* RCr 9.24.

COURT:  The two parts to this next question, *"There was discussion that initial touch happened after a birthday party.  Is there a date on the birthday party?"*  I have written back, "Any discussion of a birthday party is not relevant and not to be considered."  Anybody, anybody got any problem?  Absent your 404(b) request, any objection to that being answered that way?

COMMONWEALTH:  No, sir.

DEFENSE:  Um, no objection to it being answered that way, your honor.

COURT:  Okay.  And I –

DEFENSE:  I'm preserving, I'm reserving my objection as to a mistrial.

(Emphasis added.)

In sum, R.G. testified A.C. had told her during a cold day in 2017 that Jason had first "touched" A.C. "in a bad way" on the date of a birthday party. Sikes, for his part, testified A.C. had told him shortly after they began dating (*i.e.*, shortly after April 2017) that Jason had "started out by touching her," and that "another incident" involving "something bad" with Jason had occurred "in a different county."  This apparently caused the jury to question whether the date Jason initially "touched" A.C. occurred on the date of a birthday party, and to speculate – because the date of that birthday party had never been provided – that perhaps the initial touching had *preceded* the date of Count I.

-17-

That, in turn, leads to Jason's argument on appeal. Boiled down, he contends the trial court should have declared a mistrial because the jury may have indeed inferred that he initially "touched" A.C. at a birthday party prior to the range of dates specified in Count I. This was improper, he asserts, because the trial court had previously granted his pre-trial motion to exclude any testimony regarding that alleged incident. It was also an improper violation of his "due process right to a fair trial as guaranteed by the Fourteenth Amendment," as he asserts in his brief, because this qualified as inadmissible "other bad acts" evidence prohibited by Kentucky Rule of Evidence (KRE) 404. In that vein, he explains:

> The Supreme Court has recognized, "[T]here exists universal agreement that evidence of this sort is inherently and highly prejudicial to a defendant. It is very difficult for jurors to sift and separate such damaging information to avoid the natural inclination to view it as evidence of a defendant's criminal disposition, especially in child sexual abuse cases." *Bell v. Commonwealth*, [875] S.W.2d 882, 890-91 (Ky. 1994). See also *Clark v. Commonwealth*, 223 S.W.3d 90, 101 (Ky. 2007).

We disagree with his interpretation of KRE 404. As an aside, we have purposefully omitted any meaningful description of this "birthday party" incident (1) to underscore the full extent of what little the jury heard about it over the course of three days of testimony; and (2) because the record provides no evidence regarding that alleged incident – only conflicting assertions about it from the parties' respective counsel, put forth in their appellate briefs and during a

-18-

pretrial hearing of September 6, 2019.[7]  However, *why* Jason and the trial court deemed this "prior bad acts" evidence of the alleged birthday party incident improper and thus subject to exclusion is, from a review of the scant record before us, dubious.  As illustrated by his argument set forth above and citations to *Bell*, 875 S.W.2d at 890, and *Clark*, 223 S.W.3d at 101, the legal basis cited by Jason for excluding this evidence – which the trial court ultimately adopted in its pretrial order of September 6, 2019 – was the general rule that, in order to prove a criminal pattern of conduct or "signature crime" through evidence of a defendant's *extrinsic bad acts or crimes* against an *extrinsic victim*, the evidence in question must clearly demonstrate "the method of the commission of the other crime or crimes is so similar and so unique as to indicate a reasonable probability that the crimes were committed by the same person."  *Bell*, 875 S.W.2d at 889; *see also Clark*, 223 S.W.3d at 101 ("[G]iven the lack of distinctive similarities between Clark's conduct toward M.M. and his conduct toward E.H. and L.H., we find that the probative value of M.M.'s testimony was greatly diminished by the temporal remoteness of Clark's abuse of M.M.").  Additionally, in excluding any reference to this alleged birthday party incident, the trial court determined during the

---

[7] The details of the "birthday party" incident were initially represented by the Commonwealth in its pretrial KRE 404(c) disclosure, and during a pretrial hearing of September 6, 2019.  During the September 6, 2019 pretrial hearing, the Commonwealth indicated the incident had occurred in 2015.  During a bench conference on September 12, 2019, at 2:42 p.m., both Jason's counsel and the Commonwealth's counsel later agreed it occurred "six months" or "the summer before" January 2016.  Now, however, both parties represent in their appellate briefs that the "birthday party" incident occurred *two years before* January 2016.

September 6, 2019 pretrial hearing that it was irrelevant because, as the above tends to indicate, it occurred in a *different county*.

That said, Jason and the trial court apparently failed to appreciate the significance of the fact that that the prior "birthday party" incident did *not*, as it was described, concern a defendant's extrinsic bad act or crime against an *extrinsic* victim. Rather, it concerned a defendant's extrinsic bad act or crime against the *same* victim – which is a type of *generally admissible* "prior bad act" evidence that has little to do with whether a "signature crime" has been committed, and instead bears materially upon and may be permissibly used as evidence of *motive* – which was squarely at issue in this matter. Applying this principle in *Jenkins v. Commonwealth*, 496 S.W.3d 435, 458 (Ky. 2016), our Supreme Court explained it as follows:

> Unlike *Bell*, however, this case involves extrinsic acts perpetrated not against an "extrinsic" victim, as it were, but rather against the same person allegedly the victim of the crimes for which the defendant is being tried. Evidence of similar acts perpetrated against the same victim, we have noted many times, is "almost always admissible," under KRE 404(b), because it will almost always be significantly probative of a material issue aside from the defendant's character. *Noel v. Commonwealth*, 76 S.W.3d 923, 931 (Ky. 2002). *See also, e.g.*, *Harp v. Commonwealth*, 266 S.W.3d 813 (Ky. 2008); *Driver v. Commonwealth*, 361 S.W.3d 877 (Ky. 2012); *Lopez v. Commonwealth*, 459 S.W.3d 867 (Ky. 2015). That does not mean, of course, that evidence of prior acts against the same victim is automatically admissible—relevance to a material issue and probativeness must be shown, and

-20-

the possibility of undue prejudice must still be considered—but our experience with these cases has taught that in most of them the *Bell* inquiry leads to admission.

This case is no exception. As is often the case when sex offenses are alleged, one of the principal issues was whether a crime occurred at all. Jane alleged that Jenkins forced her into sex acts, while Jenkins denied sexual contact altogether. Relevant to that issue was whether Jenkins had a motive to do as Jane alleged, and Jane's testimony to the effect that Jenkins had done similar things to her during her childhood (seemingly without consequence) tended to show that Jenkins did indeed find Jane attractive as a vulnerable object of his sexual impulses. In this instance, therefore, Jane's "same victim" testimony served not as propensity evidence tending to show merely that Jenkins had a propensity for this type of crime; it related rather to this particular crime by tending to show that Jenkins had a motive involving this particular victim.

Apart from that, evidence of a defendant's other criminal or otherwise bad acts against the same victim is admissible under the standard of KRE 404(b) even if the evidence concerns an uncharged offense and, unsurprisingly, even if the act in question *occurred in a different county*. *See, e.g.*, *Whaley v. Commonwealth*, 567 S.W.3d 576, 586-87 (Ky. 2019) (explaining trial court's permissible admission of "same victim" bad acts evidence concerning an incident in Boone County introduced during defendant's trial for offenses committed in Kenton County).

In any event, the standard for granting a mistrial is not, as Jason appears to represent, merely whether a trial order excluding evidence – regardless

-21-

of the dubiousness of that order – was *violated*.  Rather, a mistrial is an extreme remedy that is warranted only when the record reveals "a manifest necessity for such an action or an urgent or real necessity."  *Skaggs v. Commonwealth*, 694 S.W.2d 672, 678 (Ky. 1985) (quoting *Wiley v. Commonwealth*, 575 S.W.2d 166 (Ky. App. 1978)); *see also Sherroan v. Commonwealth*, 142 S.W.3d 7, 17 (Ky. 2004).  The occurrence complained of must be of such magnitude that the litigant would be denied "a fair and impartial trial and the prejudicial effect can be removed in no other way."  *Gould v. Charlton Co.*, 929 S.W.2d 734, 738 (Ky. 1996).

Moreover, there is a well-established presumption that the jury will follow the trial court's admonition, which usually cures any harm caused by the occurrence.  *Sherroan*, 142 S.W.3d at 17 (quoting *Alexander v. Commonwealth*, 862 S.W.2d 856, 859 (Ky. 1993), *overruled on other grounds by Stringer v. Commonwealth*, 956 S.W.2d 883, 891 (Ky. 1997)); *Graves v. Commonwealth*, 17 S.W.3d 858, 865 (Ky. 2000).  And, conspicuously absent from Jason's brief is any mention of the following facts:  (1) after *each* of the three offending statements italicized above, Jason declined offers from the trial court to appropriately admonish the jury; and (2) after the jury asked its question, the trial court *did* admonish the jury that "[a]ny discussion of a birthday party is not relevant and not

-22-

to be considered" – an admonition to which Jason raised no objection apart from preferring a mistrial.

This presumption is overcome in only two situations: (1) when an overwhelming probability exists that the jury is incapable of following the admonition *and* a strong likelihood exists that the impermissible evidence would be devastating to the defendant; or (2) when the question was not premised on a factual basis and was "inflammatory" or "highly prejudicial." *Johnson v. Commonwealth*, 105 S.W.3d 430, 441 (Ky. 2003). "This standard is the same where the movant waives the protections of an admonition due to oversight or as a matter of trial strategy." *Sherroan*, 142 S.W.3d at 17. When evidence of prior crimes or bad acts is "introduced into evidence through the non-responsive[8] answer of a witness, this [C]ourt must look at all of the evidence and determine whether the defendant has been unduly prejudiced by that isolated statement." *Phillips v. Commonwealth*, 679 S.W.2d 235, 237-38 (Ky. 1984). The trial court

_____

[8] Relative to this point, on September 13, 2019 (the third and final day of the trial in this matter), when the trial court addressed Jason's motion for a mistrial regarding these three remarks, the trial court explained:

> I agree that there was an indication of another act. Um, but it was, they never mentioned it was in Edmonson County. But, it was in fact mentioned by two witnesses. I also believe that had this been a police officer or a professional witness, I may look at this differently. However, I believe that, I have little doubt that, and I don't think [the defense] has argued that the Commonwealth in any way intentionally brought out that testimony. I think lay witnesses get on the stand, they start answering our questions, and then they forget that there's this legal border, this legal boundary that they're not to cross.

has broad discretion to determine whether to grant a mistrial, *Matthews v. Commonwealth*, 163 S.W.3d 11, 17 (Ky. 2005), and that court's decision should not be disturbed on appeal absent an abuse of discretion. *Bray v. Commonwealth*, 177 S.W.3d 741, 752 (Ky. 2005).

Here, as Jason's motion for a mistrial related not to a "question" but to the effect of what he characterizes as impermissible evidence of his alleged prior bad act toward A.C., the operative inquiry is whether: (1) an overwhelming probability existed that the jury was incapable of following the admonition; and, *if so*, (2) a strong likelihood existed that the impermissible evidence was devastating to Jason. *See Johnson*, 105 S.W.3d at 441. And, regarding the former point,

> we do not expect a jury to erase from their minds what they have heard; and we do not expect testimony or evidence to be "unheard." *Bartley v. Commonwealth*, 400 S.W.3d 714, 736 (Ky. 2013). However, we do expect that instructions from the trial court will make clear what jurors are to disregard and what they are not allowed to consider.

*Roberts v. Commonwealth*, 599 S.W.3d 841, 852 (Ky. 2020).

Here, nothing of record rebuts the presumption that the jury would heed the admonition that "[a]ny discussion of a birthday party is not relevant and not to be considered." Indeed, the jury's question about the birthday party did not come *after* the trial court's admonition, but *before* it. Furthermore, despite Jason's waiver of any admonition regarding Sikes's reference to "another county," the jury

-24-

never asked any question in that respect, and the jury instructions specifically required the jury to consider incidents that had occurred in Warren County *only*. The wording of these admonitions was unambiguous, and the path on how to proceed set out in the admonitions was clearly marked for the jury. The trial court's admonitions carried a high probability that the jury would follow the instructions they were given. Accordingly, this alone is reason enough to affirm the trial court's decision not to grant a mistrial.

As to the latter point, the record likewise fails to demonstrate a strong likelihood existed that the "impermissible" evidence was "devastating" to Jason. *See Johnson*, 105 S.W.3d at 441. As discussed, "this [C]ourt must look at all of the evidence and determine whether the defendant has been unduly prejudiced by that isolated statement." *Phillips*, 679 S.W.2d at 238. Here, Jason takes issue with three brief and isolated statements made over the course of a three-day trial. The witnesses who made the statements – R.G. and Sikes – both repeatedly testified that they had no personal knowledge of whether Jason had ever had any inappropriate contact with A.C. More to the point, the one person who claimed Jason *did* have inappropriate contact with A.C. – namely, A.C. herself – testified only that it occurred in January 2016, as set forth in Counts I, II, and III; and that prior to that time, she had had a high opinion of Jason and had felt comfortable around him:

COMMONWEALTH: What was, before he started living with you, how long did you know Jason?

A.C.: My whole life.

COMMONWEALTH: Your whole life. And what did you think of him?

A.C.: I thought he was fun and cool. He was kind of the cool one in the family that took you to do fun things.

COMMONWEALTH: What would you do together?

A.C.: We would go shopping. We would ride around. Just whatever we wanted to do, really.

COMMONWEALTH: And did he help your mom out while he was living with you guys?

A.C.: Sort of. Um, for example, my mom would give him money to go buy the groceries while she was at work.

COMMONWEALTH: And, did he drive you to your activities?

A.C.: Yes. He took me to almost all of my games that I had to cheer at because my mom was at work.

Considering what is set forth above, the trial court's decision to deny Jason's motion for a mistrial did not amount to an abuse of its discretion.

### III. OTHER EVIDENTIARY ISSUES

Apart from what has already been discussed, Jason also raises several evidentiary issues which, in his view, warrant a new trial. To begin, Jason argues he is entitled to a new trial due to the following testimony from R.G.:

COMMONWEALTH: So, we're going to focus again on the night in the garage, when you said that you were talking to [A.C.] And, what did she tell you?

[R.G.]: That, uh, she was raped.

COMMONWEALTH: And, did she indicate to you a time that that happened?

[R.G.]: Yes.

COMMONWEALTH: When did she tell you that had happened?

[R.G.]: She said that one of the nights was when I was admitted into the hospital.

COMMONWEALTH: Well, you say "one of the nights." Was there another time when she told you it had happened as well?

[R.G.]: Yes.

COMMONWEALTH: Do you recall how much time had passed between when she told you that happened, and the time she was telling you?

[R.G.]: It'd been a while. Like, a year or two.

COMMONWEALTH: Okay. And who did she say did those things to her?

[R.G.]: Jason.

COMMONWEALTH: Um, do you recall what it was that brought about [A.C.] telling you that about that time?

[R.G.]: Um, she said that at the time, she was dating a guy, and that she'd talked to him about it, and he told her that she needed to talk to me.

-27-

COMMONWEALTH: And, what was her demeanor
when she was telling you these things?

[R.G.]: What do you mean?

COMMONWEALTH: How was she acting?

[R.G.]: While she was telling me?

COMMONWEALTH: Yes.
[R.G.]: She was upset.

COMMONWEALTH: She was upset?

[R.G.]: Yeah.

COMMONWEALTH: What do you mean by "upset"?

[R.G.]: She was crying.

Jason takes issue with R.G.'s testimony set forth above because, in the words of his brief, "it was unnecessary to have other witnesses repeat what AC said out-of-court. AC testified in open court." And, he adds, these statements "served only to bolster AC's credibility."

As the exchange set forth above makes apparent, however, any such purported "error was not preserved by a contemporaneous[9] objection and so our

---

[9] Jason asserts his "objection" to this testimony was preserved because, as he argues in his brief, "Defense counsel made a motion in limine to exclude hearsay, including prior consistent statements unless it countered a charge of recent fabrication. The Commonwealth agreed to exclude all hearsay." However, that is not enough. As explained by our Supreme Court,

An objection made prior to trial will not be treated in the appellate court as raising any question for review which is not strictly within the scope of the objection as

-28-

review is for palpable error[.]" *King v. Commonwealth*, 472 S.W.3d 523, 528 (Ky. 2015). And, the admission of this testimony does not rise to the level of palpable error. Palpable error requires a showing of "manifest injustice," RCr 10.26, which Jason has failed to demonstrate. Where impermissible testimony is cumulative of other testimony – which Jason acknowledges is the case here – its admission is harmless error. *White v. Commonwealth*, 5 S.W.3d 140, 142 (Ky. 1999) (admission of hearsay testimony rendered cumulative and harmless by nearly identical testimony of two other witnesses); *Patterson v. Commonwealth*, 555 S.W.2d 607, 609 (Ky. App. 1977) (same).

Jason also requests review of several other evidentiary issues which, as he acknowledges, he likewise failed to preserve. Again, we may only grant relief for an unpreserved error when the error is (1) palpable; (2) affects the substantial rights of a party; and (3) has caused a manifest injustice. *Commonwealth v. Jones*, 283 S.W.3d 665, 668 (Ky. 2009).

The first issue concerns evidence the Commonwealth adduced demonstrating that between early February 2016 (when Jason moved out of A.C.'s

---

made, both as to the matter objected to and as to the grounds of the objection. It must appear that the question was fairly brought to the attention of the trial court. . . . *One claiming error may not rely on a broad ruling and thereafter fail to object specifically to the matter complained of.*

*Lanham v. Commonwealth*, 171 S.W.3d 14, 21 (Ky. 2005) (emphasis added) (quoting *Tucker v. Commonwealth*, 916 S.W.2d 181, 183 (Ky. 1996)).

residence) and June 27, 2018 (the date he was arrested following his indictment in this matter), Jason and his wife and children moved on three separate occasions, residing in Denver, Colorado; Panama City, Florida; and in an RV in Mt. Pleasant, Tennessee. Regarding this evidence, Detective Rebecca Robbins, who testified that she began efforts to locate Jason in May 2017 shortly after A.C. reported this matter to the police, stated at trial that Jason's changes of residence made her efforts somewhat difficult. The Commonwealth also commented on this evidence during its closing arguments, suggesting Jason and his family had "lived off the grid in an RV" while in Tennessee, and, "It's an awful lot of moving around."

In his brief, Jason argues "the fact that [he] moved several times after the alleged incidents happened at [R.G.'s] house was not probative guilt. Reasons existed for his moves." And, to be sure, Detective Robbins further qualified her own testimony by adding there was "nothing unusual" about Jason's changes of residence; and Jason and his wife, Holly, provided extensive testimony regarding why they moved, which Jason summarizes in his brief as follows:

> Holly Bowles testified that they moved from Alabama to Kentucky because they were going to take over the mortgage in his grandmother's house but the heat was not on so [R.G.] invited them to stay in her home. They moved to Denver, Colorado after that; [Jason's] oldest daughter lived there. After a year they moved to Panama City, Florida to be nearer to family. She said it was a spur of the moment decision by [Jason] to leave Denver. They stayed in Florida a year – they tried not to move around too much for their children. Then they moved to

-30-

> Mt. Pleasant, Tennessee where they lived in an RV while they built a house. [Jason] always worked. The prosecutor asked if Holly knew what the term "off the grid" meant and she said she did. The prosecutor asked if that was how they were living. Holly said kind of, they still had cable TV and cell phones and stuff like that. [Jason] explained why they moved to those places, including that they left Kentucky because Holly was having an affair with her boss.

(Record citations omitted.)

To be clear, the Commonwealth adduced this evidence to demonstrate Jason's "flight" from Kentucky – and by extension his consciousness of guilt. And to be sure, such evidence can be relevant and admissible. *See Day v. Commonwealth*, 361 S.W.3d 299, 303 (Ky. 2012) ("As a general rule, proof of flight to elude capture or prevent discovery is admissible because flight is always some evidence of a sense of guilt." (Citation and internal quotations omitted)).

However, even assuming this evidence fell short of what could be considered proper evidence of "flight," this evidence was not so prejudicial as to bear upon Jason's substantial rights, and it came nowhere near rendering his trial manifestly unjust. *See Jones*, 283 S.W.3d at 668. As set forth above, Jason had the opportunity to rebut it at trial; he and Holly testified extensively regarding the circumstances of their moves; and, as noted, even Detective Robbins testified she saw "nothing unusual" about it. Accordingly, this provides no basis for reversal.

The second issue concerns evidence the Commonwealth adduced regarding a trip to Wal-Mart. In the relevant part of his brief, Jason argues:

> The prosecution elicited evidence that [Jason] and AC had gone to WalMart together on one occasion. [R.G.] testified it was just the two of them on the trip to Walmart and they were gone about 30 to 45 minutes. [N.G.] testified she remembered [Jason] taking AC to WalMart at midnight because she had a yeast infection and needed medicine for it. [N.G.] wanted to go but [Jason] told her to stay home and play with his laptop. [N.G.] said WalMart was not that far away and they were gone almost an hour.
> . . .
>
> The prosecution also tried to infer [Jason] had done something improper by taking AC to WalMart one night for approximately an hour. All agreed the trip was to get either groceries or Monistat for AC. It also appeared [R.G.] had asked him to take AC. But no inference can be drawn from the testimony about the WalMart trip that makes it more or less likely that rape and sex abuse alleged occurred on different dates. It did allow the jury to speculate that [Jason] had done something improper during the trip.

(Internal record citations omitted.)

However, the Commonwealth's purpose for introducing this evidence was to establish *opportunity*, which was a central issue in this matter. From the outset, Jason asserted that, due to the number of people residing at A.C.'s residence and the relatively small size of the residence, he had few opportunities to be alone with A.C. However, the fact that Jason was nevertheless able, as a routine matter, to be alone with A.C. for approximately an hour at or around midnight on occasion

-32-

tended to contradict the notion that he lacked any opportunities to be alone with her, or – of equal importance – the notion that his being alone with her would have raised any strong suspicions of wrongdoing. "Implicit in the concept of palpable error correction is that the error is so obvious that the trial court was remiss in failing to act upon it *sua sponte*." *Lamb v. Commonwealth*, 510 S.W.3d 316, 325 (Ky. 2017). Here, there was no such obvious error.

The third issue concerns testimony the Commonwealth elicited from A.C.'s younger sister, N.G. Her relevant testimony was as follows:

> COMMONWEALTH: When Jason first came to live with you, and you all are related so I'm guessing have you known him a long time?
>
> N.G.: My whole life.
>
> COMMONWEALTH: What did you think of Jason?
>
> N.G.: At the beginning, or –
>
> COMMONWEALTH: Yes.
>
> N.G.: – or when he first came for Christmas?
>
> COMMONWEALTH: When he came for Christmas. What did you think about him?
>
> N.G.: I felt something was off. He, we used to be close when I was younger, and our relationship wasn't how it was. He felt different, weird to me. Like, my gut feeling was different. Just, he felt off.
>
> COMMONWEALTH: Was it different the whole time he lived with you?

N.G.:  Yeah.

COMMONWEALTH:  Did you see any things that you thought were weird?

N.G.:  Yeah.

COMMONWEALTH:  Like what?

N.G.:  Jason, instead of when, like, his wife and my sister were sitting on the couch, he would go sit beside my sister instead of his wife.

COMMONWEALTH:  How did Jason act around your sister other than by wanting to sit by her?

N.G.:  He was weird.  He would make weird comments about the way she dressed.  And I would never hear him comment about, like, the way his wife dressed.  And, it was just off to me.  In my gut feeling, I knew something was wrong.

COMMONWEALTH:  Do you remember any of the comments that you heard Jason make about your sister?

N.G.:  I remember one time, my sister was wearing leggings and she was getting ready to get into his truck because we were going somewhere, and he made a comment about them.

COMMONWEALTH:  About the leggings?

N.G.:  Yeah.

COMMONWEALTH:  Do you remember what it was?

N.G.:  Not particularly, but it was something about her legs, or the leggings, or something like that.

COMMONWEALTH: And she was getting in the truck. Where in the truck was [A.C.] getting in?

N.G.: The front. She always sat in the front.

COMMONWEALTH: Did you ask to sit in the front?

N.G.: I would, but I would never get to.

COMMONWEALTH: You would never get to, is that what you said?

N.G.: Hardly ever.

COMMONWEALTH: Did you ever know of Jason buying your sister anything?

N.G.: Yeah.

COMMONWEALTH: Do you remember what he bought her?

N.G.: He bought her boots, her and her friend boots. A Victoria's Secret shirt. And some other things, but those are the only things I can remember.

As to why Jason takes issue with this testimony, he presents the

following argument in his brief:

[N.G.] testified after [Jason] came to live with them she thought something was off. "He felt weird to me, my gut feeling was different." She saw things she thought were weird like him sitting next to AC on the couch, allowing AC to ride in the front seat of the car, and making "weird" comments about the way she dressed like complimenting her leggings. She said, "My gut feeling, I know something was wrong."

. . .

-35-

[N.G.'s] speculation was certainly inadmissible. It was improper opinion evidence violating KRE 701. What [N.G.] described was not "an observed phenomenon where there exists no other feasible alternative by which to communicate that observation to the trier of fact." *Clifford v. Commonwealth*, 7 S.W.3d 371, 374 (Ky. 1999).

We disagree. As indicated, Jason apparently believes, in light of what is set forth above, that N.G. provided impermissible "lay opinion" testimony in violation of KRE 701, which provides:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are:

(a) Rationally based on the perception of the witness;

(b) Helpful to a clear understanding of the witness' testimony or the determination of a fact in issue; and

(c) Not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Here, N.G.'s opinion was "[n]ot based on scientific, technical, or other specialized knowledge," per subsection (c). Distilled to its essence, N.G.'s opinion was that Jason acted less like a relative toward A.C., and more like a male attracted to a female – something well within the purview of lay testimony. Per subsection (a), it was also rationally based upon N.G.'s perception of how Jason acted toward AC: he preferred sitting next to A.C., rather than his wife; he made comments about A.C.'s appearance, but not his wife's appearance, and Jason's

comments about A.C.'s appearance made N.G. feel uncomfortable; and, she recalled Jason took A.C. shopping and purchased gifts for A.C.

And, per subsection (b), N.G.'s opinion testimony was indeed relevant to the determination of a fact in issue in this matter – namely, motive. To paraphrase *Jenkins*, 496 S.W.3d at 457, as is often the case when sex offenses are alleged, one of the principle issues was whether a crime occurred at all. A.C. alleged Jason forced her into sex acts, while Jason denied sexual contact altogether. Relevant to that issue is whether Jason had a motive to do as A.C. alleged, and N.G.'s testimony to the effect that Jason acted less like a relative toward A.C., and more like a male attracted to a female, tended to show that Jason did indeed find A.C. attractive as a vulnerable object of his sexual impulses. We therefore find no error relative to this testimony, palpable or otherwise.

## IV. CONCLUSION

We have addressed the breadth of Jason's arguments. He has presented no instance of reversible error. We therefore AFFIRM.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Kathleen K. Schmidt
Assistant Public Advocate
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Courtney J. Hightower
Assistant Attorney General
Frankfort, Kentucky