RENDERED: OCTOBER 23, 2025
TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0507-MR

KEVON LAWLESS                                        APPELLANT


V.

ON APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE A. C. MCKAY CHAUVIN, JUDGE
NOS. 20-CR-001499-001 & 22-CR-001786


COMMONWEALTH OF KENTUCKY                        APPELLEE


**OPINION OF THE COURT BY JUSTICE THOMPSON**

**REVERSING AND REMANDING**


Kevon Lawless was convicted after a jury trial on two counts of murder and one count of first-degree burglary. The jury also found aggravating circumstances existed due to the murders occurring during the commission of a burglary. Lawless was sentenced to life without the possibility of parole on each murder count and ten years for first-degree burglary enhanced to twenty years by virtue of Lawless being a persistent felony offender in the second degree (PFO-2).

Lawless appeals to this Court as a matter of right arguing that the trial court committed reversible error by: denying his motion for a mistrial once it was known that the jury had become aware that a witness had been ordered taken into custody by the trial court at the conclusion of his testimony for lying on the stand; denying his motion made pursuant to Kentucky Revised Statutes

(KRS) 532.135 to exclude the death penalty; and denying him a second motion for a continuance made in relation to his motion to exclude the death penalty.

We conclude that a mistrial should have been declared once the trial court was made aware that the entire jury had been improperly informed that a key Commonwealth witness had not only been taken into custody, but had also been accused of perjury by the trial court. Therefore, we reverse and remand.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On August 14, 2020, Brandon Waddles and Waddles's three-year-old daughter, Trinity Randolph, were murdered in their residence. Lawless was indicted by a Jefferson County Grand Jury on October 7, 2020, on two counts of murder, and one count each of first-degree burglary and being a convicted felon in possession of a handgun.

On June 7, 2021, the Commonwealth filed a Notice of Aggravating Circumstances pursuant to KRS 532.025 due to the murders being committed in the course of the commission of a first-degree burglary, where the killings were intentional and resulted in multiple deaths. KRS 532.025(2)(a)2. and 6.

On August 7, 2022, Lawless filed a motion to exclude the death penalty and a motion to continue his trial. According to Lawless's counsel, the request for continuance followed "several significant last-minute disclosures of school records" to the mitigation specialist who had been retained on Lawless's behalf as well as the recent enactment of KRS 532.130 - 532.140. On August 9, 2022, the trial court denied the motion to continue and scheduled the hearing on the motion to exclude the death penalty for September 9, 2022, which was the day

2

after jury selection was set to begin.[1] On September 8, 2022, Lawless's trial began with *voir dire* and jury selection. The trial resumed on September 15, 2022.

While there were no eyewitnesses to the murders, the Commonwealth presented evidence and testimony consistent with its theory that Lawless had enlisted his girlfriend, Akoi Reclow, who was seventeen at the time, to contact Waddles to first make Waddles believe she wanted to start a relationship with him and then to draw Waddles into a situation where he could be ambushed. Later, after Reclow had told Waddles she was on her way to see him at Waddles's home, Evan Ross drove Lawless to Waddles's residence. Reclow, who had not accompanied Ross and Lawless, then texted Waddles and asked him to come outside to see her.

According to the Commonwealth, when Waddles opened his door expecting to see Reclow, Lawless emerged from Ross's vehicle with a .40-caliber handgun and ultimately fired eleven rounds striking Waddles six times and his daughter twice. Numerous text and social media exhibits were introduced by the Commonwealth evidencing this "set up" and Lawless's motivation for revenge against Waddles.

---

[1] Lawless initiated an original action with this Court for writs of mandamus and prohibition requesting this Court prohibit the trial court enforcing the order denying a continuance and also order the trial court to continue the trial date. This Court denied Lawless's petition on September 7, 2022. *Lawless v. Hon. A.C. McKay Chauvin & Commonwealth of Kentucky*, No. 2022-SC-0343-MR (September 7, 2022) (unpublished).

Both Reclow and Ross testified at Lawless's trial. Each of them had previously entered into plea agreements wherein they had each pled guilty to two counts of facilitation to murder. Those plea agreements contemplated their cooperation and testimony against Lawless consistent with their prior statements to the Commonwealth. Reclow's case was still pending in juvenile court, while Ross had received a ten-year probated sentence. Both proved to be, at best, reluctant witnesses.

Reclow ultimately testified that she aided Lawless in setting up Waddles to be robbed. Ross testified that he gave Lawless a ride to Waddles's residence believing he was driving Lawless to meet a woman. Ross denied hearing any gunshots after Lawless had exited his car, explaining that the music he was playing in his car was very loud.

At the conclusion of Ross's testimony on September 19, 2022, the jury was excused for a break. However, members of the media (and at least one television camera) remained present in the courtroom.

While the jury was absent, the trial court announced that Ross would be taken into custody. The trial court found, *sua sponte*, that probable cause existed to find Ross had violated the terms of his plea and diversion agreements by committing perjury during the course of his testimony. Subsequently, at least one media outlet reported Ross's arrest and at least one juror watched this report.

On September 21, 2022, after both sides had rested, the jury was instructed and began deliberations. During deliberations late that afternoon,

4

the jury sent out a note advising the court they had become aware that Ross had been arrested for "lying on the stand" and one member of the jury felt they could "no longer make a decision truthfully" after being informed of his arrest. Lawless's counsel moved for a mistrial which was denied.

It was ultimately determined that one of the jurors, whose identity remains unknown (Juror 1), informed the other jurors that they had seen a television report concerning Ross's arrest. Subsequently, as a result of this information, another juror, also not identified (Juror 2), determined to change their vote.

The trial court, after questioning the jury, ultimately determined to replace one juror[2] who volunteered that she could no longer render a verdict based solely on the evidence presented at trial. This singular juror was replaced with a randomly chosen alternate who was called back into court that evening. After the alternate juror reported to court, the jury was instructed to begin their deliberations anew.

Later that evening, the newly-composed jury found Lawless guilty of both counts of murder and one count of burglary in the first degree. The parties agreed to go directly into the capital penalty phase of the trial and after hearing opening statements from counsel, mitigation evidence from the defense, aggravating circumstances evidence from the Commonwealth, and closing statements, the jury found that aggravating circumstances existed with respect

---

[2] It is not known if this juror was the same person (Juror 2) who spoke up during deliberations stating they could "no longer make a decision truthfully."

to the murders of Waddles and Randolph, namely, that Lawless committed these murders while he was engaged in the commission of first-degree burglary. The jury recommended fixing the penalty for both murder convictions at "confinement in the penitentiary for life without benefit of probation or parole" and the circuit court adopted the jury's recommendation.

The trial court also addressed Lawless's other charges and the Commonwealth moved to sever the remaining possession of a handgun by a convicted felon charge, and Lawless, acting in reliance on an agreement reached with the Commonwealth, waived his right to be sentenced by the jury on the first-degree burglary conviction and entered a plea of guilty to being a PFO-2. The remaining possession of a handgun by a convicted felon charge was later dismissed.

## II. ISSUES

Lawless argues the trial court erred by: (1) not granting his motion for a mistrial relative to the jury being informed that a witness had been taken into custody for allegedly lying on the stand; (2) denying his motion made pursuant to KRS 532.135 to exclude the death penalty as a potential sentence owing to alleged mental illness; and (3) not granting a second motion for a continuance sought by his trial counsel relative to the preparation and presentation of his motion to exclude the death penalty.

**A. The Trial Court Committed Reversible Error by not Granting a Mistrial After Being Advised One of its Members had Informed the Whole Jury that the Trial Court had Ordered a Key Commonwealth Witness be Arrested for Perjury.**

Lawless argues that the trial court committed reversible error by refusing his counsel's motion for a mistrial after it became known that the jury had been made aware of the fact that the trial court had ordered Ross to be taken into custody. According to Lawless, the failure of the trial court to order a mistrial denied Lawless a fair and impartial verdict because the trial court's opinion of a key witness's testimony served to taint the entire jury. The underlying facts of this issue are not at issue and were reflected sufficiently in the trial's video record.

Lawless, the Commonwealth, and the trial court all agreed that Ross lacked credibility. The unanswered question is, when was he lying? The Commonwealth asserts that his feigned ignorance of the murders was where he perjured himself. At trial, Lawless's counsel attempted to discredit Ross's testimony that it was Lawless who was in Ross's car on the night of the murders which placed him at the scene of the crimes.

After Ross's testimony, and out of the presence of the jury, the trial court *sua sponte* ordered that Ross be taken into custody remarking that Ross "didn't tell the truth, the whole truth, and nothing but the truth," and that he "clearly lied any number of times," and noted that lying under oath was a clear violation of Ross's probation, and something that the trial court had a responsibility not to ignore. As discussed above, the trial court's decision to

7

arrest Ross was noted by the media and reported to the public which had been following this trial.

Two days later, after the jury was instructed and began its deliberation, a jury member penned a note which was forwarded to the trial court. The note stated:

> While in deliberation it was mentioned that there was a statement that Evan Ross was arrested for lying on the stand. This statement has caused a juror to feel they can no longer make a decision truthfully after having heard this. Before having heard this, the juror was thinking one way but is now feeling differently.

Lawless's counsel moved for a mistrial and maintained that position throughout all discussions. The Commonwealth was initially noncommittal and even indicated it might join such motion due to the fact that if Lawless was found not guilty, the Commonwealth would not be able to appeal.

Over Lawless's objection, the trial court determined that it would instead instruct the jury that Ross's arrest would neither be admitted or denied, but that it was not in evidence and thus could not be considered in their deliberation. The trial court informed counsel that it would ask the jurors if they believed that they could still render a verdict based solely on the evidence. The trial court also noted there were only two alternate jurors available, and therefore, as long as no more than two jurors excused themselves, a mistrial would not be necessary.

The trial court then recalled the jury to the courtroom and read the note to them. The jury was informed that the trial court was "not saying [Ross's

8

arrest] happened," nor was it "saying [it] didn't happen," but what mattered was that such an occurrence was "not evidence."

The trial court asked the jury as a whole:

Is there anything that has happened during the course of this trial, up to and including your deliberations, which has impacted your ability to base your decision solely on the evidence that's presented inside this courtroom? Or can you compartmentalize and separate anything else, any extraneous information or misinformation, that you may have heard or think you heard, and base your decision solely on the evidence presented inside the courtroom? Is there anyone who cannot do this, and please be honest?

One female juror raised her hand and was questioned further at the bench before being excused from further service. This juror advised the trial court that she was not the source of the information shared with the jury and that it was another jury member who reported seeing a media report of the arrest and relayed that information to the rest of the jury members. The juror also reported that another juror had family that once lived in the residence where the murders occurred.

The trial court did not ask this juror if she was the same juror mentioned in the note as "feeling differently" after hearing of Ross's arrest. The trial court did not ask the juror who it was on the jury that shared news of Ross's arrest with the rest of the jury. Those questions were also not posed to the remaining jurors. Those questions remain unanswered. No other jurors were individually questioned by the trial court.

The trial court then posed an open-ended question to the remaining jurors asking if there was anything else that would give them cause to believe

9

that they could not render a fair and impartial verdict and none of the remaining jurors responded.

### (1) Standard of Review on Issues Concerning Mistrials

A mistrial is an extreme remedy for trial courts. Arguing that a mistrial was necessary in this instance is a concomitant high bar for an appellant. For a mistrial to be granted, there must be "a manifest necessity for such action or an urgent or real necessity." *Skaggs v. Commonwealth*, 694 S.W.2d 672 (Ky. 1985). We have also recognized that "[i]t is universally agreed that a mistrial is an extreme remedy and should be resorted to only when there is a fundamental defect in the proceedings which will result in a manifest injustice." *Gould v. Charlton Co.*, Inc., 929 S.W.2d 734, 738 (Ky. 1996). The defect in the proceedings "must be of such character and magnitude that a litigant will be denied a fair and impartial trial and the prejudicial effect can be removed in no other way." *Id.* The "fair and impartial trial" referred to in *Gould* is that to which all citizens are entitled and guaranteed within the Sixth Amendment to the United States Constitution, and Sections 7 and 11 of the Kentucky Constitution.

In the specific context of extra-judicial information reaching the jury, we previously determined in *Gould* that there was no presumption that "[o]nce a juror is exposed to extra-judicial information that juror is automatically presumed 'legally tainted,'" and further explained:

> When a juror acquires extra-judicial information during trial, the trial court should inquire into the juror's views in a manner calculated to discover those views. Relying on the totality of the

10

> inquiry, rather than on a predictable response to a so-called "magic question," it is within the trial court's sound discretion to determine the effect of the extra-judicial information. The trial court must then determine whether there is a manifest necessity for a mistrial due to an error affecting the substantial rights of the parties where prejudice cannot be otherwise removed. Whether removal of prejudice can be accomplished by a curative admonition or whether a mistrial is necessitated is a matter within the sound discretion of the trial court.

929 S.W.2d at 740.

It is also well established that "[j]urors are presumed to have followed an admonition." *Tamme v. Commonwealth,* 973 S.W.2d 13, 26 (Ky. 1998). However, any such presumption can be rebutted "when there is an overwhelming probability that the jury will be unable to follow the court's admonition *and* there is a strong likelihood that the effect of the inadmissible evidence would be devastating to the defendant[.]" *Johnson v. Commonwealth,* 105 S.W.3d 430, 441 (Ky. 2003) (citing *Alexander v. Commonwealth,* 862 S.W.2d 856, 859 (Ky. 1993)).

Subsequent caselaw post-*Gould* clarifies that extra-judicial information, if it causes a jury to not be impartial, constitutes a structural error which automatically taints a jury and requires that a new trial be provided.

In 2018, we recognized that matters which call into question a defendant's right to an impartial jury trial are structural errors necessitating a reframing of our standard of review, an abandonment of any notions of harmless error, and recognition of a presumption of prejudice.

> Defendants are guaranteed the right to an impartial jury by the Sixth Amendment to the United States Constitution, as well as

11

Sections Seven and Eleven of the Kentucky Constitution. Denial of a defendant's right to an impartial jury is a structural error. *Hayes v. Commonwealth,* 175 S.W.3d 574, 586 (Ky. 2005). It is therefore not subject to harmless error analysis, as **prejudice is presumed**. *See Shane v. Commonwealth,* 243 S.W.3d 336, 341 (Ky. 2007) ("Harmless error analysis is simply not appropriate where a substantial right is involved."). "[T]he defining feature of a structural error is that it 'affect[s] the framework within which the trial proceeds,' rather than being 'simply an error in the trial process itself.' For the same reason, a structural error 'def[ies] analysis by harmless error standards.'" *Weaver v. Massachusetts* [582 U.S. 286], 137 S.Ct. 1899, 1907-08, 198 L.Ed.2d 420 (2017) (internal citations omitted).

*Commonwealth v. Douglas,* 553 S.W.3d 795, 799–800 (Ky. 2018) (emphasis added).

The United States Supreme Court opinion in *Weaver v. Massachusetts,* which builds upon two prior opinions of that Court, and which is cited by our own Court in *Douglas* states:

The Court now turns to the proper remedy for addressing the violation of a structural right, and in particular the right to a public trial. Despite its name, the term "structural error" carries with it no talismanic significance as a doctrinal matter. It means only that the government is not entitled to deprive the defendant of a new trial by showing that the error was "harmless beyond a reasonable doubt." *Chapman* [*v. California*], 386 U.S. 18, 24 (1967). **Thus, in the case of a structural error where there is an objection at trial and the issue is raised on direct appeal, the defendant generally is entitled to "automatic reversal" regardless of the error's actual "effect on the outcome."** *Neder v. United States,* 527 U.S. 1, 7, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).

582 U.S. 286, 299 (2017), (Emphasis added).

The language "generally entitled to 'automatic reversal'" found in *Weaver*, while certainly tipping the balance to the defendant, does not mandate reversal in all circumstances. The circumstances under which particular extra-judicial information, or outside influences, mandate a new trial and the manner in which that determination should be made, has been previously explored in the federal circuits. In *United States v. Cheek*, 94 F.3d 136 (4th Cir.1996), the Fourth Circuit Court of Appeals applied a presumption of prejudice to all "extrajudicial communications and contacts," when they amounted to more than "innocuous interventions," and permitted rebuttal of the presumption by the government when it could demonstrate that there existed no reasonable possibility they influenced the verdict.

Somewhat similarly, the Ninth Circuit determined that "[a] defendant is entitled to a new trial when the jury obtains or uses evidence that has not been introduced during trial if there is 'a reasonable possibility that the extrinsic material *could* have affected the verdict.'" *Dickson v. Sullivan*, 849 F.2d 403, 405 (9th Cir.1988). The Ninth Circuit determined that the prosecution bears the burden of proving beyond a reasonable doubt that extrinsic evidence did not contribute to the verdict. *Id.* at 405–06.

**(2) Application to a Jury Which has Been Tainted by Extraneous Information**

The first element for us to consider is recognition of the nature of the information improperly relayed to the jury. When the trial court decided, *sua sponte,* in front of the media and with the jury still in close proximity to the

13

proceedings, to arrest Ross while stating that there was "no doubt that [Ross] perjured [himself]" and that he "clearly lied," it created a grave risk that the jury would discover not only that Ross had been arrested, but that the trial court had made an extreme, adverse, determination regarding the truthfulness of a prosecution witness. That is exactly what ultimately transpired.

The trial court's actions and statements, as communicated by the media report which Juror 1 shared with the rest of the jury, could only result in the jurors believing that the trial court had already adjudged Ross's credibility and found him to have been not only "less than completely honest," but to have committed criminal perjury necessitating his immediate imprisonment.

"Matters of a witness's credibility and of the weight to be given to a witness's testimony are **solely** within the province of the jury." *King v. Commonwealth*, 472 S.W.3d 523, 526 (Ky. 2015) (emphasis added). A trial court may not substitute its own judgment of the credibility of a witness for that of the jury and neither may it attempt to, by its words or actions, sway a jury's own impressions.

In the matter of *Quercia v. United States*, 289 U.S. 466, 468 (1933), the trial judge had explicitly told the jury that he "th[ought] that every single word [one witness] said, except when he agreed with [other prosecution] testimony, was a lie." The United States Supreme Court determined that this direct commentary on one of the witness's testimony was error and "highly prejudicial." *Id.* at 472. Certainly, in Lawless's case, the trial court did not

14

intend for its decision to arrest Ross, or its statements regarding Ross's testimony, to be heard or discovered by the jury, but they were.

A question left unanswered in the record is, what part(s) of Ross's testimony had the trial court determined to be false and what part(s) of Ross's testimony did the jurors believe the trial court had found to be false. It may have been Ross's testimony that he did not hear gunshots after he dropped off Lawless. That was the only testimony explicitly described by the trial court when it placed Ross under arrest. However, it is not clear how explicit the media report Juror 1 heard was about what testimony the trial court suggested was perjured, and what Juror 1 then communicated to the rest of the jurors about the report. It is also unclear whether the jury speculated about what part of Ross's testimony was perjured. These matters were never clarified. The jurors may have thought, for example, that Lawless informed Ross of his pre-planned intentions to commit murder and burglary and they jointly conspired to commit these crimes, meaning that Ross lied by minimizing what took place, perhaps even omitting damning statements that Lawless made to him. Therefore, Ross's perjury could have been to benefit Lawless by making him seem less culpable, and thus provided reasonable doubt where otherwise there would be none.

As to the juror who admitted to the trial court that she could no longer render a verdict based solely on the evidence presented at trial, our concerns only grow. The trial court did not ask the juror anything of substance. She was not asked to identify Juror 1 who had informed the rest of the jurors of the

15

news report on Ross's arrest. She was not asked exactly what the jury had been told by Juror 1. She was not asked how much discussion was had by the jury, and by whom on the jury, after they were informed of Ross's arrest but before they reported the issue to the trial court. She was not asked if, prior to hearing of Ross's arrest for perjury, she had considered Lawless guilty or not guilty. If she had previously considered Lawless to be not guilty, then her exposure to the out-of-court information denied Lawless at least one juror who would have voted to find him not guilty and who could have thwarted his conviction by causing a hung jury.

Likewise, we do not know who composed the note given to the trial court, nor do we know the identity of Juror 2 who was referenced in the note as "feel[ing] they can no longer make a decision truthfully." The trial judge did not confirm that the juror who raised her hand after his questioning, and was subsequently excused, was the same juror, Juror 2, who had voiced their misgivings during deliberations.

There is no dispute about the substance of information to which the jury was exposed in this case, or the timing and circumstances of that exposure. Juror 1 reported the media coverage of Ross's arrest for perjury; this tainted the jury as a whole. It is undisputed that accurate information, from an authoritative source was brought to the attention of the full jury well before a verdict of guilt was returned. Such information was immediately prejudicial—at that time—to either the Commonwealth or to Lawless. It should be axiomatic that a trial court instructing a jury to ignore exculpatory evidence would be

16

"devastating to the defendant" and that is, almost literally, what in effect occurred here. *See Johnson,* 105 S.W.3d at 441.[3]

There is no need to presume prejudice in this case as prejudice is obvious and self-evident. It is only in retrospect, following a guilty verdict, that we are asked to discern the extent to which it may have prejudiced Lawless. Ross was a significant witness for the Commonwealth. While video of a person exiting a car near the scene of the crimes was presented, it was Ross who confirmed that it was his vehicle which appeared near the crime scene and Ross was the sole witness identifying Lawless as the occupant who exited the vehicle thereby definitively placing Lawless in physical proximity to the crime scene near the time of the murders. Assuming *arguendo* that a jury would ever be able to disregard the trial court arresting such a key witness for perjury, the limited admonition attempted by the trial court once the situation became known was inadequate under the circumstances where it was left unknown to what extent the knowledge of Ross's arrest for perjury had already improperly, and quite probably irreparably, influenced the jury's deliberative process.

Given the overall context and content of the extra-judicial information which came to the jury during deliberations, we determine that such incident was inherently prejudicial to Lawless and created a patent structural defect in Lawless's trial. Whether or not such a fundamental flaw and obvious prejudice

---

[3] "There are only two circumstances in which the presumptive efficacy of an admonition falters: (1) when there is an overwhelming probability that the jury will be unable to follow the court's admonition *and* there is a strong likelihood that the effect of the inadmissible evidence would be devastating to the defendant[.]"

could have even been corrected, and our concerns ameliorated, by additional questioning of the jury's members cannot be determined here as we find that the trial court's questioning of the jury was insufficient to allay our concern for the impact of such extra-judicial information on the jury's deliberations. The manifest nature of this error tainted the jury and effectively eliminated Lawless's right to receive a fair trial determined by an untainted and impartial jury as guaranteed by the Sixth Amendment to the United States Constitution, and Sections 7 and 11 of the Kentucky Constitution.

**B. Did the Trial Court Commit Reversible Error by not Granting Lawless's Motion to Exclude the Death Penalty or When It Refused to Grant Lawless a Continuance?**

Lawless argues that the trial court committed reversible error "in not granting a motion for continuance after the defense received relevant records requiring further investigation." The records Lawless references were educational records obtained relative to his motion to exclude the death penalty made pursuant to KRS 532.135. He also, and separately, argues the trial court's ultimate determination to not exclude the death penalty was in error.

Both of these arguments are now moot. In *Brown v. Commonwealth*, 313 S.W.3d 577 (Ky. 2010), which relied on *Bullington v. Missouri*, 451 U.S. 430 (1981), our Court recognized that once a jury has been given the opportunity to recommend the death penalty but determines the penalty to be inappropriate, double jeopardy attaches and on retrial the Commonwealth may not again seek the death penalty.

18

## III. CONCLUSION

The trial court committed reversible error by denying Lawless's motion for a mistrial after the jury became aware of the trial court arresting a key Commonwealth witness for perjury. We vacate Lawless's convictions and remand to the Jefferson Circuit Court for further proceedings consistent with this opinion.

All sitting. Lambert, C.J.; Conley, Goodwine, and Nickell, JJ., concur. Bisig, J., dissents by separate opinion in which Keller, J., joins.

BISIG, J., DISSENTING:  While I unequivocally agree with the Majority's conclusion that juror knowledge of the trial judge detaining a key witness for alleged perjury was error, given the remedial steps immediately taken by the court and the totality of evidence presented at trial, I would affirm the conviction.

As the Majority Opinion states, a mistrial is an extreme remedy for trial courts and should only be granted in situations of real, urgent, or manifest necessity. *Skaggs v. Commonwealth,* 694 S.W.2d 672, 678 (Ky. 1985).  Indeed, where an error is of a constitutional dimension, we may affirm the conviction so long as the error was "harmless beyond a reasonable doubt." *Dillon v. Commonwealth*, 475 S.W.3d 1, 15 (Ky. 2015).  An error is harmless beyond a reasonable doubt if there is no "reasonable possibility" that it "might have contributed to the conviction." *Commonwealth v. Armstrong*, 556 S.W.3d 595, 604 (Ky. 2018) (quoting *Talbott v. Commonwealth*, 968 S.W.2d 76, 84 (Ky. 1998)).  Thus, we consider the error "in the context of the entire trial" and ask

whether there is any reasonable possibility it might have contributed to the conviction. *Staples v. Commonwealth*, 454 S.W.3d 803, 826-27 (Ky. 2014). If so, the conviction must be reversed. If not, the conviction may be affirmed.

Here, the jury appropriately reported to the court that a juror had extrajudicial information from a news story about the arrest of a witness. Upon learning the information, the trial judge consulted with counsel and brought the jury back into the courtroom. He admonished the jury very clearly that any information that may or may not be true regarding a news story outside of the evidence presented at trial was not to be considered. He questioned the jury as to whether despite this directive, any of them believed the information would impact their ability to make true decisions in the case. He replaced the one juror who answered in the affirmative with an alternate.[4] He reiterated the serious nature of the inquiry and asked if any other jurors had an issue. He also explained that the rules of court required the remaining jurors to begin their deliberations anew with the alternate juror. It is well established in our jurisprudence that jurors are presumed under our law to follow an admonishment given by the court. *Tamme v. Commonwealth*, 973 S.W.2d 13, 26 (Ky. 1998).

---

[4] Judge Chauvin had previously told the two alternate jurors, on the record, that they were to continue to maintain the Court's prior admonishments about not discussing the case or doing outside research. He obtained contact information from these jurors advising them that it was possible if there were a problem such as a health issue with another juror, they may need to be recalled back to service.

Next, it is critical to look at the nature of the information alleged to have tainted this jury, and the totality of the evidence, proffered defense, and argument by counsel. This analysis is to determine if in the context of the entire trial, this information contributed to a conviction. The witness at issue, Evan Ross, was a longtime friend and associate of the Defendant Lawless. Ross testified he drove Lawless to the victim's home the day of the shooting. The core theory of Defense counsel's cross examination of Ross was establishing he was untruthful. He was asked on repeat questions about his willingness to say anything to save himself. Even a lay person observing Ross' testimony at trial would reach the conclusion he was recalcitrant, uncooperative, evasive, and difficult. In fact, attacking the credibility and veracity of this witness was important enough to the defense that in closing argument, counsel for Lawless called him a liar. He further emphatically stated it was "self-evident" from Ross' testimony he was lying. Finally, he told the jury Ross lied "straight to your face." The nature of the "outside" trial information was that Ross was untruthful and as a result detained by the court.

Further, the jury heard significant testimonial and physical evidence supporting its verdict in the case. While not recounting the entirety of the trial, the jury saw an Instagram live video of Lawless and the victim arguing with harsh words and showing weapons prior to the murder. The victim was seen taunting Lawless regarding the death of another friend. Video evidence obtained from more than one source showed a dark Chrysler 200 as the vehicle driving the shooter to and from the crime scene. Neighbors also witnessed this

21

vehicle. Evan Ross was the owner of the vehicle. Ross told the jury he was close with Lawless and drove him in that very vehicle to the victim's home the day and time of the shooting. Akoi Reclow, a friend/girlfriend of Lawless, but unknown to Ross, testified she assisted Lawless in setting up the victim Waddles to be robbed the day in question. Lawless directed Reclow to begin luring the victim to want to see her when he was with Reclow the night before the shooting. She texted the victim with an offer to hook up. Reclow testified she directed Lawless via phone to the victim's home. Reclow directed the victim Waddles to come outside as Lawless arrived. Those messages were shown to the jury as extracted from her phone. Police testified there were three shots fired outside and eight shots fired inside the home. A medical examiner testified Brandon Waddles and his 3-year-old daughter Trinity Randolph were killed by gunshot wounds. Lawless' physical description is consistent with video evidence of the individual exiting and re-entering the Chrysler the moment of the shooting. Despite Lawless' alibi that he was at a Goss Avenue Kroger, cell data obtained from his phone places him in the vicinity of the crime scene at the time of the shooting. Cell phone records show Lawless communicating with Reclow and Reclow communicating with the victim immediately proceeding the shooting. Transcripts of the content of these messages were shown to the jury. The jury saw undisputed information that Lawless changed his phone number following the shooting. Upon Lawless' direction, Reclow also contacted her phone carrier and changed her phone number after the shooting. In a controlled call to Lawless by Reclow as part of

22

her statement to police, Lawless stated he was avoiding the south end of town because things were "hot." A previously published music video featuring Lawless and Ross together was deleted from the internet. Importantly, the jury learned both Reclow and Ross pled guilty to charges of Facilitation to Murder.

The constitutional importance of protecting the impartiality of jurors in the trial process is paramount. Balancing this important truth with the weight of the evidence against the Defendant, the nature of the specific facts in this trial, the nature of the extrajudicial information openly disclosed by the jury, and the steps immediately taken by the court including an admonishment, I do not join the structural error analysis of the Majority where prejudice is presumed. Instead, I find no prejudice to the dignity of the verdict reached by this jury. Our case law gives wide discretion to the trial court when ruling on a motion for a new trial and the judge's decision should not be disturbed on appeal absent manifest error or a finding of abuse of discretion. *Gould v. Charlton Co., Inc.,* 929 S.W.2d 734, 741 (Ky. 1996) (*citing Gray v. Sawyer,* 247 S.W.2d 496 (Ky. 1952)).

Finally, Lawless raised two additional allegations of error. These additional issues were not addressed in the Majority Opinion because having found reversal warranted by the jury issue, it declines to address the remaining allegations. The two additional issues were: 1) the trial court's denial of Lawless' motion to continue the trial, and 2) a challenge to the trial court's denial of Lawless' motion to exclude the death penalty. Both motions dealt with the timing of the hearing of the motion to exclude the death penalty and the

merits of the trial court's decision to deny the motion. The parties address these motions in briefing to the court; however, ultimately, any error in this aspect would be harmless as the death penalty is not part of the sentencing in this case. Accordingly, for all of these reasons, I would affirm the trial court.

Keller, J., joins.

COUNSEL FOR APPELLANT:

Kevin M. Glogower

COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Matthew F. Kuhn
Solicitor General of Kentucky

John H. Heyburn
Principal Deputy Solicitor General

Shawn D. Chapman
Deputy Solicitor General